UNITED STATES of America,
Plaintiff–Appellee,

v.

Arthur A. ALLEN, Peter A. Diffenderfer, Kevin T. Kerr, William P. Kolander, Derek S. Sherman, Spencer C. Sherman, and Gary L. Theriaque, Defendants–Appellants.

Nos. 79–1059, 79–1060 and 79–1063 to 79–1067.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1979.

Decided Nov. 5, 1980.

Rehearing Denied Dec. 31, 1980.

Martin Weinberg, Boston, Mass., Marcus S. Topel, San Francisco, Cal., argued for defendants–appellants; Oteri & Weinberg, Boston, Mass., Robert F. Collins, Troy & Collins, Dorchester, Mass., on brief.

David Smith, Crim. Div., Washington, D. C., for plaintiff–appellee.

Before KENNEDY, TANG and ALAR-CON, Circuit Judges.

KENNEDY, Circuit Judge.

After customs interdiction of an amphibious operation to import over eight tons of marijuana, the participants were convicted of federal offenses. These appeals followed. Appellants allege the prosecution used evidence resulting from unlawful surveillance and illegal seizures and arrests, that the evidence was insufficient, and that the sentences were improper. We reject these contentions and affirm.[1]

## I. FACTS

In the summer of 1977, Arthur Allen purchased 200 acres of coastal property near Coos Bay, Oregon. The property was located in a secluded area. It came to be known as the Allen Ranch. The ranch was parallel to the ocean for about one mile, but it was separated from the beach by a narrow strip of federal property. Shortly after purchasing the property, Allen posted "No Trespassing" signs at points around the perimeter of the property and constructed a gate across the main access road to the ranch. Allen also terminated the previous owner's practice of permitting local fishermen and hunters to cross the property to reach the federal property on the ocean side.

On November 6, 1977, the United States Customs Bureau opened an office in Coos Bay. The officer in charge, Larry Gano, almost immediately became aware of complaints from local residents who had been refused permission to cross the Allen Ranch. A check on Allen's background led Gano to suspect that the ranch might be a drug–smuggling base. On December 5, 1977, Gano accompanied members of the Coast Guard on a helicopter flight past the ranch. According to the Government, the Coast Guard routinely flew over private property on the Oregon coast for training flights and other purposes, including law enforcement. Using a telephoto lens, Gano took photographs of the ranch property. The photos revealed unusually wide tire tracks leading to and from a barn and a new extension built on the barn.

The next day, Gano accompanied two officials of the Bureau of Land Management (BLM) to the ranch. In response to the number of complaints they had received from fishermen and hunters, the officials sought to obtain a public easement across the ranch. As the men approached the ranch house, Allen appeared at the door and told them to leave. After one of the BLM officers identified himself and stated that they wanted to talk about obtaining a public easement across the property, Allen allowed them to approach. When Allen asked to see their identification, the BLM officials produced theirs, but Gano, not wanting to reveal his identity as a customs official, said his was at home. While on the property, Gano noticed that it was not being used as a farm and that Allen's hands were not calloused.

Because his observations increased his suspicion, Gano decided to monitor vehicular activity in and out of the property by implanting seismic sensors at the entrances. The sensors detect vibrations which vehicles cause as they pass by. According to the Government, they are capable of distinguishing people and animals from vehicles. These sensors emit a series of beeps recorded or monitored at a unit some distance away. Gano also set up a command post in the hills directly east of the Allen Ranch. While planting the sensors on federal land near the ranch, a customs officer noticed tire tracks 78 inches wide running from a river to a road which led to the ranch. The tracks were wider than those made by a dune buggy or other such vehicles. Beginning on December 8, 1977, the ocean, beach, and a small portion of the ranch were kept under nearly constant surveillance by officers using a variety of vision–enhancing devices. On the night of December 18, the officers noticed a significant increase in vehicular activity on the ranch; although they could not actually see any vehicles, they could see the glare of moving lights.

---

1. The related appeal of Gerald E. Maggiacomo, 79 ·1062, has been dismissed on motion of the appellant.

The next day, Gano, strongly suspecting that a conspiracy to import marijuana was under way, met with the local sheriff and Coast Guard officials to develop a contingency plan for interdicting the operation. Two days later, on December 21, Gano made a second helicopter overflight. An officer looking through binoculars saw a large van and semi–trailer parked on the property. As a result of this discovery, Gano put the Sheriff's department and Coast Guard on the alert and intensified the surveillance.

At approximately 10:00 p.m. on December 29, after the surveillance team saw light signals passing between the beach and an unlighted vessel positioned just offshore, Gano alerted the Coast Guard and Sheriff's department to prepare for action pursuant to the pre–arranged plan. It soon appeared, however, that the suspected smuggling operations had been called off due to bad weather. Some of the officers, at Gano's request, then entered Allen's property and searched a graveled clearing, described as a "parking lot," on the west end of the ranch. According to the Government, the officers found nothing of any use to the investigation. Assuming that the vessel would attempt to offload the following night, Gano directed all personnel to regroup then.

At approximately 10:30 p.m. on December 30, the officers at the command post saw an unlighted vessel just offshore, near the Allen property. At approximately 11:45 p.m. a team stationed by the beach saw a flash of light from the vessel. At 1:00 a.m. the beach team saw an amphibious vehicle. Shortly thereafter it entered the water and proceeded to the ship. Gano telephoned the Coast Guard and put the contingency plan into effect.

At 3:00 a.m. the first amphibious vehicle returned to shore and the beach team overheard the sound of boxes being unloaded and people congratulating each other. At 4:45 a.m., when the vehicles returned from a second trip out to the vessel, the officers ignited a flare as a signal to begin the arrests. The men on the beach were ordered to freeze, but they scattered as soon as the flare went out. At the same time, the vessel was illuminated by a Coast Guard helicopter. Waiting teams of officers then swarmed the property. The beach team secured the amphibious vehicles, the van and semi–trailer parked nearby, and they looked into all the vehicles. The officers discovered boxes in the trailer, on the beach, and in the amphibious vehicles. They cut one open and found marijuana inside. The officers then inventoried the contents of the trailer and van, including unlocked luggage and attache cases. While these operations were performed on land, the ship was tracked by the use of radar and helicopters.

One of the arrestees told officers that there were a few unarmed men in the ranch house. The officers then entered the house to secure it and conducted a brief search, but found no one inside. Apparently the officers proceeded to most parts of the house. While there, the officers observed radio equipment. They so testified at trial.

At approximately 5:00 a.m. the ship, which was about eight miles offshore, was illuminated again by the Coast Guard helicopter and ordered to stop and identify itself. It identified itself as the Cigale, of Panamanian registry. The crew of the vessel was either in the process of, or then began, throwing boxes over the side. The Coast Guard later boarded the vessel, which by that time had been abandoned by its crew and was flooded with water. The Coast Guard, fearing that the Cigale would sink, seized some documents from it. The Coast Guard retrieved 174 boxes from the water, two of which had burst open revealing the contents to be marijuana.

Because it was suspected that some of the participants had fled in the darkness, a law enforcement bulletin was issued to check anybody in the vicinity of the Allen Ranch who was wet or cold and without identification. At approximately 11:30 a.m. on December 31 (about seven hours after some suspects fled from the beach), a Coos Bay police officer saw Kolander sitting in a field a few miles from the beach. The police

officer stopped to question him. The officer noticed a bulge in Kolander's pocket and that he was wet. The officer frisked him, found a pair of pliers similar to a pair seen at the Allen Ranch, and arrested him. Kerr was apprehended walking along the highway in a full skindiver's wetsuit at 5:30 p.m. that day. Spencer Sherman was arrested at 9:00 p.m. that evening while he was hitchhiking on the highway near the ranch, wearing soaking wet clothes covered with sand. Allen was arrested at 6:00 p.m. on January 2, 1978 (approximately 37 hours after the suspects fled from the beach) after he was seen coming out of the bushes into the road. Solely on the suspicion engendered by his presence in the area, a deputy sheriff ordered Allen to lie on the ground, frisked him, and handcuffed him. He was identified by the search as Arthur Allen and placed under formal arrest.

Shortly before appellants' trial was to begin, the trial judge became unavailable, and Judge Conti of the Northern District of California was designated to hold court in the district of Oregon. After the defense moved for change of venue based on pretrial publicity, Judge Conti transferred the case to his own court in the Northern District of California. All appellants were convicted of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); Allen, Diffenderfer, Kerr, Derek Sherman, Spencer Sherman, and Theriaque were convicted also of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846; Allen was convicted also of conspiracy to import marijuana, in violation of 21 U.S.C. § 963.

Appellants make numerous fourth amendment challenges to their convictions. They contend that the warrantless surveillance of the Allen Ranch prior to the full-scale interdiction operation on December 31 was a series of unlawful searches. They object to the helicopter overflights, to the use of seismic sensors and vision-enhancing devices, and to Gano's posing as a BLM official. They also contend that the enforcement operations on December 31, both on land and sea, violated the fourth amendment, and that the subsequent arrests of Kolander, Kerr, Sherman, and Allen were illegal. Appellants also challenge the sufficiency of the evidence supporting their conviction. Finally, they claim that the assignment, trial, and sentencing proceedings were prejudicial in various ways.

## II. FOURTH AMENDMENT ISSUES

Under *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the controlling question for most of the search issues here is whether the government agents intruded upon the defendants' reasonable expectation of privacy. Several courts have expressed concern about unregulated use by police of sophisticated electronic surveillance devices. *See, e.g., United States v. Curtis*, 562 F.2d 1153, 1156 (9th Cir. 1977)[2]; *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977)[3]; *United States v. Solis*, 536 F.2d 880 (9th Cir. 1976)[4]; *United*

---

2. "The three judges here concerned wish to make it clear that in this age of ever-advancing sophistication in the development of electronic eavesdropping devices, they are not insensitive to unjustifiable intrusions on the right of privacy, a right that is deemed to be most precious to the American people. Law enforcement agencies should not have carte blanche power to conduct indiscriminate surveillance for unlimited periods of time of varying number of individuals. Our conclusion as to the propriety of the installation and use of the transponder in this case is predicated upon [the fact that] here the officers, prior to the installation, had been given reliable information ... that the plane was being utilized in the pursuit of criminal activity."
562 F.2d at 1156.

3. The court in *Moore* expressed concern about use of electronic beepers, and it distinguished beepers from "magnification of the observer's senses [by] use of a helicopter, binoculars, radar, or the like." 562 F.2d at 112.

4. The court in *Solis* said:
Aids such as flashlights or binoculars raised no great problem and at one time the line between legal observation and illegal invasion was drawn at physical trespass within a protected area. However, the use of sophisticated modern mechanical or electronic devices and the frightening implications of their possible development have led to abandonment of the test of physical trespass within the protected area and a broadening of protection to cover a "reasonable expectation of

*States v. Cofer,* 444 F.Supp. 146, 149 (W.D. Tex.1978) [5]; *United States v. Kim,* 415 F.Supp. 1252, 1255–56 (D.Haw.1976) [6]; *Phelan v. Superior Court,* 90 Cal.App.3d 1005, 153 Cal.Rptr. 738 (1979); *People v. Sneed,* 32 Cal.App.3d 535, 108 Cal.Rptr. 146 (1973) (use of helicopter to obtain otherwise unobtainable observations of marijuana plants growing on a twenty–acre ranch "unreasonable governmental intrusion"). On the other hand, this circuit has indicated in several contexts that the police may observe people or places aided through use of a variety of tools which materially enhance or assist the senses, without first having to secure a search warrant. In *United States v. Dubrofsky,* 581 F.2d 208, 211 (9th Cir. 1978), for example, the court said: "Permissible techniques of surveillance include more than just the five senses of officers and their unaided physical abilities. Binoculars, dogs that track and sniff out contraband, search–lights, fluorescent powders, automobiles and airplanes, burglar alarms, radar devices, and bait money contribute to surveillance without violation of the Fourth Amendment in the usual case." *See also United States v. Solis, supra,* 536 F.2d at 882 (use of trained dogs to smell marijuana inside a trailer from place twenty–five yards away and accessible to the public not a fourth amendment violation); *United States v. Bronstein,* 521 F.2d 459, 461–63 (2d Cir. 1975) (marijuana smelling dogs at airport); *United States v. Minton,* 448 F.2d 37, 38 (4th Cir. 1973) (binoculars may be used without warrant); *People v. Superior Court,* 37 Cal.App.3d 836, 112 Cal.Rptr. 764 (1974) (use of helicopter without warrant upheld); *Dean v. Superior Court,* 35 Cal. App.3d 112 (1973) (same). We conclude

that while the police surveillance in this case was extensive, it did not violate any reasonable expectation of privacy which the defendants had with regard to the objects, places, and activities viewed.

## A. Helicopter Surveillance

The defendants [7] contend, and the Government does not show otherwise, that the objects pictured in the photographs–the various vehicles parked on the grounds, the wide tracks from the barn, and the new extension built on the barn–could not be observed from any land or sea based vantage point outside the boundaries of the property. Although the record is equivocal, it appears further that normal cameras would not have disclosed the objects seen in the blow–ups of the photos. From these facts defendants seek to establish a legitimate expectation that these areas were to remain private.

We agree with the defendants that a person need not construct an opaque bubble over his or her land in order to have a reasonable expectation of privacy regarding the activities occurring there in all circumstances. Given the sophistication of electronic photographic devices today, there probably are few unenclosed locations which could not be observed from some airborne location. We are not presented with an attempt to reduce, by the use of vision–enhancing devices or the incidence of aerial observation, the privacy expectation associated with the interiors of residences or other structures. *Cf. United States v. Taborda,* 491 F.Supp. 50 (E.D.N.Y.1980) (surveillance of defendants' living room

---

privacy." This we take to be the test, to be applied to the circumstances of each case. 536 F.2d at 882 (citations omitted).

5. "[T]he Court cannot countenance the potentially unlimited duration of this type of surveillance [electronic beepers]. Citizens have a right to think that the government will not track them for months on end by resort to the latest electronic gadgetry." 444 F.Supp. at 149.

6. "It is inconceivable that the government can intrude so far into an individual's home that it

can detect the material he is reading and still not be considered to have engaged in a search." 415 F.Supp. at 1255–56.

7. In light of our disposition, we need not decide which of the defendants would have an expectation of privacy in the objects and places observed by the Government based on their differing interests in the property and goods. *United States v. Salvucci,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

window by means of high–powered telescope from apartment across street is search requiring compliance with fourth amendment).

■ Coast Guard helicopters routinely traversed the area near the Allen Ranch for several reasons, including law enforcement. Moreover, officer Gano already had some facts which justified a suspicion that the ranch might be used for drug smuggling. If there is some justification for concentrating a surveillance on a particular place, as opposed to random investigation to discover criminal activity, that factor is weighed in the balance and contributes to justification for the surveillance. This proposition is an appropriate implementation of our precedents in resolving the difficult question concerning when devices can be used to aid the senses to observe activity occurring in open or public places consistently with the fourth amendment. *See United States v. Curtis, supra,* 562 F.2d at 1156.[8] In addition, at least some courts have approved warrantless surveillance from helicopters. *See, e.g., People v. Superior Court, supra; Dean v. Superior Court, supra. But see People v. Sneed, supra.* Although the issue is not entirely free from doubt, we conclude that the defendants did not have a reasonable expectation that the extension on the barn, the presence of the vehicles, and the tracks leading from the barn would not be noticed and recorded by officers in the Coast Guard helicopter.

Several factors distinguish this case from others and reduce the ranch residents' reasonable expectation of privacy. The Allen Ranch is virtually on the United States sea–coast border, *see United States v. Stanley,* 545 F.2d 661, 666 n.6 (9th Cir. 1976) (en banc), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), and Coast Guard helicopters routinely traversed the nearby air space for several reasons, including law enforcement. The residents of the Allen Ranch would, no doubt, have been aware of these routine flights and any reasonable person, cognizant of the ranch's proximity to the coastline and the Coast Guard's well–known function of sea–coast patrol and surveillance, could expect that government officers conducting such flights would be aided by sophisticated electronic equipment. As such, the residents could not reasonably bear a subjective expectation of privacy from the Coast Guard's airborne telephotographic scrutiny, particularly where, as here, the objects observed were large scale modifications of the Allen Ranch landscape and barn.

B. *Seismic Sensors*

■ Although the record is unclear on the point, placement of the seismic sensors could raise a potentially complex fourth amendment issue insofar as entry upon the Allen property and maintaining the sensors on that property in an operating condition may constitute distinct types of trespass with different fourth amendment consequences. *See, e.g., United States v. Dubrofsky,* 581 F.2d 208 (9th Cir. 1978); *United States v. Basile,* 569 F.2d 1053 (9th Cir.), *cert. denied,* 436 U.S. 920, 98 S.Ct. 2268, 56 L.Ed.2d 761 (1978); *United States v. Hufford,* 539 F.2d 32 (9th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976); *United States v. Capps,* 435 F.2d 637 (9th Cir. 1970). We need not resolve this question, however, because appellants have pointed to no evidence obtained by use of the sensors not already known from other sources, and therefore any fourth amendment violations are harmless error and produced no tainted evidence.

C. *Surveillance from the Hill*

■ This circuit has held that the use of aids to the senses such as binoculars does

---

8. We recognize that the rule we state here, and the rationale of the *Curtis* case, blur somewhat the usual fourth amendment analysis, which first distinguishes between searches and less intrusive police conduct, and then requires that the former be supported by probable cause and, except in unusual cases, by a warrant as well. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The rationale of this case and the rationale of *Curtis* do not mean that activity which is indisputably a search can be justified by less than probable cause.

not convert unobjectionable surveillance into a prohibited search. *See Dubrofsky, supra,* 581 F.2d at 211; *Solis, supra,* 536 F.2d at 882. Surveillance of the open fields on the ranch from the hill observation site and use of binoculars violated no reasonable expectation of privacy of the defendants.[9]

D. *Physical Intrusions*

■ The December 6 entry by Gano while accompanying the BLM officers was unobjectionable. The other officers had a right to enter to discuss the possibility of granting an easement through the ranch to the federal property on the other side, and Gano did not violate the fourth amendment by concealing his identity as a Customs Bureau official. *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *United States v. Glassel,* 488 F.2d 143, 145 (9th Cir. 1973). Although the trespass by officers on the night of December 29 onto the parking lot area may present constitutional questions, *see, e.g., Wattenburg v. United States,* 388 F.2d 853 (9th Cir. 1968), no evidence was taken, and none appears tainted, as a result of the officers' actions. We doubt that these trespasses violated the fourth amendment, *see, e.g., Basile, supra,* 569 F.2d at 1056; *United States v. Williams,* 569 F.2d 823 at 826; *United States v. Capps,* 435 F.2d 637, 640 (9th Cir. 1970), but since no evidence resulted from the actions we need not further consider the matter. *Cf. United States v. Cella,* 568 F.2d 1266, 1284–86 (9th Cir. 1977); *United States v. Cales,* 493 F.2d 1215, 1215–16 (9th Cir. 1974) (where government investigation already focused, illegal search producing some intensification of surveillance does not taint evidence subsequently obtained if search does not direct investigation to the specific evidence sought to be suppressed).

E. *The December 30 Arrest at the Allen Ranch*

■ The officers had probable cause to enter Allen's property and arrest the defendants on the night of December 30.

They observed the offloading activities from an unlighted vessel in the middle of the night and the sound of people congratulating each other, and these facts, together with all the other information then available to them, justified a belief that a crime was being or had just been committed. It was not necessary for them to secure an arrest warrant for the arrest made on Allen's property but not in his home. *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976); *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–828, 46 L.Ed.2d 598 (1976).

F. *The December 30 Searches*

■ The search of the ranch house did not violate the fourth amendment. The officers had surprised an unknown number of people suspected of importing a large quantity of drugs in the middle of the night. They were told by one arrestee that there were some men in the ranch house. The agents were not obliged to believe the arrestee's statement that the men in the house were unarmed. These facts, plus the distinct possibility of destruction of evidence or armed defendants inside the house, constitute exigent circumstances which justify the search without a warrant. *See United States v. Flickinger,* 573 F.2d 1349, 1355–56 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. Gaultney,* 581 F.2d 1137, 1146–48 (5th Cir. 1978). The remaining searches are either justified by one of the exceptions to the warrant requirement or constitute harmless error.

G. *The Subsequent Search Warrants*

■ Following the arrest and searches on the night of the 30th, law officers returned to the ranch on December 31 with a search warrant authorizing a search of the residence and outbuildings of the ranch "for the narcotic drug marijuana and papers and documents relating to the trafficking of marijuana." Two more similar searches

---

9. *United States v. Curtis,* 562 F.2d 1153 (9th Cir. 1977) does not require a different result.

were conducted in January of 1978. Defendants challenge the warrants as defectively overbroad.

The Supreme Court has expressed concern for warrants authorizing seizure of papers and documents, *Andresen v. Maryland*, 427 U.S. 463, 480–83, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976), but warrants with language comparable to that involved here have been upheld. *See United States v. Dubrofsky, supra*, 518 F.2d at 213; *United States v. Prewitt*, 553 F.2d 1082, 1086 (7th Cir. 1977). *See generally United States v. Johnson*, 541 F.2d 1311 (8th Cir. 1976). In any event, the items sought to be suppressed are two small amounts of marijuana and a receipt identifying defendant Kerr as the purchaser of the red Ford van. Both items are merely cumulative evidence of facts proved through other evidence as well.

### H. *Stopping and Boarding of Cigale*

██ The stopping of the Cigale, the arrest of its crew, and the coincident seizure of evidence can be sustained on either of two grounds. First, as we understand the record, the Coast Guard kept contact with the ship by radar and helicopter, and the helicopter crew that ordered the ship to stop was in radio contact with ground units on the beach. If this is correct, there was probable cause to stop the ship and arrest its crew, since it was established that it had accomplished a nighttime offloading followed by actions on the beach, including flight of the suspects.

Even on the assumption, however, that Coast Guard units which stopped the Cigale and arrested its crew had not been in constant contact with the ship, or did not know all that had transpired on the beach, the furtive nighttime offloading had been established. Since the Cigale was in the area, it was proper for the Coast Guard to stop it for questioning. *United States v. Piner*, 608 F.2d 358, 361 (9th Cir. 1979); *United States v. Williams*, 589 F.2d 210, 214 (5th Cir. 1979); *United States v. Odneal*, 565 F.2d 598, 601 (9th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803

(1978). The reasonable suspicion to stop ripened into probable cause to search and arrest when the crew of the Cigale was observed throwing boxes of cargo overboard and when the Cigale failed to respond to further communications or to stop.

### I. *Arrests of Kerr, Kolander, and Allen*

██ There was probable cause to arrest Kerr, Kolander, and Spencer Sherman. Each man was apprehended near the Allen Ranch. Kerr was apprehended while wearing a wet suit shortly after the unloading of boxes from the Cigale on amphibious vehicles. Kolander was wet and had a noticeable bulge in his pocket which provided reasonable suspicion for the officers to conduct a frisk. *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12, 98 S.Ct. 330, 333–34, 54 L.Ed.2d 331 (1977); *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). When the officers found a pair of pliers of the type used at the Allen Ranch, they had probable cause to arrest Kolander. Sherman was arrested while hitchhiking on a highway where hitchhiking was rare. He was wet and his clothes were sandy, though the weather throughout the state that day had been clear and dry. Sherman had no identification and no explanation for his presence on the highway or his appearance.

██ We agree, however, that Allen's arrest was illegal. The police, of course, had probable cause to arrest Allen, but they did not know that the man they arrested was Allen until after the arrest occurred. Nevertheless, an illegal arrest is not a basis for reversing a conviction. *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952). Allen contends that his conviction should be reversed because the arrest was necessary evidence of his presence at the ranch and his involvement in the crime. We disagree. The only evidence obtained from the arrest was a key taken from Allen's wallet which led the officers to Allen's safe deposit box. In the box the officers found defendant Theriaque's certificate of ownership for his dogs and the Allen Ranch purchase agreement. This evidence was cumulative of the testi-

mony of several of the witnesses who testified at trial and its admission does not amount to prejudicial error.

### III.  SUFFICIENCY OF THE EVIDENCE

The thrust of appellants' arguments on the sufficiency of evidence is that the evidence against them is circumstantial. There is, nevertheless, more than enough evidence, direct, testimonial, and circumstantial, to establish beyond a reasonable doubt "an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Oropeza*, 564 F.2d 316, 321 (9th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

The evidence of each appellant's role in the smuggling will be discussed briefly. Allen bought the ranch, appeared to be in charge, and was present for most of December.  He alone was convicted of count II–conspiracy to import marijuana, 21 U.S.C. §§ 812, 952(a), 960, 963 (1976). Kerr arrived between December 16th and 20th, was found wearing a wet suit of the type worn by those who transferred the contraband from the Cigale to the amphibious vehicle, and was found carrying over $2,600 in cash.  Derek Sherman bought the ship Cigale in Germany for over $300,000, and was the navigator from Thailand to the United States coast.  Spencer Sherman, Derek's brother, traveled from the East Coast to take part in the unloading operation, arriving between December 16th and 20th.  Theriaque bought the guard dogs–appropriately named Bonnie and Clyde–and was found in a wet suit like Kerr's, indicating involvement in the transfer of contraband at sea.  Diffenderfer arrived between the 16th and 20th of December as well, and was seen running from the semi–trailer during the sweep.  All of these six men–Al-

len, Kerr, Derek Sherman, Spencer Sherman, Theriaque, and Diffenderfer–were convicted of count I, conspiracy to possess a controlled substance with intent to distribute, 21 U.S.C. §§ 812, 841(a)(1), 846, as well as count III, possession with intent to distribute, 21 U.S.C. §§ 812, 841(a)(1); 18 U.S.C. § 2.

Kolander was convicted only of possession, count III.  Kolander was present at the ranch during December.

The appellants all offer similar arguments as to the asserted inadequacy of the evidence.[10]  As to both count I, conspiracy to possess with intent to distribute, and count III, possession with intent to distribute, they reiterate that the contraband must be known by the defendants to be a controlled substance for the convictions to stand.  Appellants' counsel imaginatively suggest that appellants could have thought the "sealed and odorless metal boxes" contained "silk or some other cargo."  While not completely out of the realm of possibility, this suggestion is implausible enough in this context that a rationale trier of fact could have believed it false beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 324–26, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979) (due process standard of review on habeas petition).  The appellants' attack on sufficiency of evidence concerning intent to distribute is similarly baseless: personal consumption of 17,000 pounds of anything, much less marijuana, is a staggering proposition sufficient to compel disbelief, leaving commercial distribution as the only realistic goal of the enterprise. There is testimony that the fee for unloading this cargo–the work of a few hours–was $10,000.  The scale of the undertaking, and its secrecy, indicate that no one would have been admitted to the enterprise who was not to be trusted completely with knowledge of its criminal character.  *See United States v. Pentado*, 463 F.2d 355, 362–63 (5th Cir.), *cert. denied*, 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972).

---

**10.** Although we view the reasoning set out above as adequate by itself to establish the sufficiency of the evidence, we also accept and adopt the evidentiary arguments made by the Government with respect to each defendant.

Appellants also raise several times the argument that they had insufficient dominion and control to be convicted of possession. This argument is irrelevant. They do not even contest the government's assertion that they aided and abetted criminal possession, and it is a fundamental principle of federal criminal law that one who aids and abets is punishable as a principal. 18 U.S.C. § 2 (1976). Count III of the indictment specifically alleged violation of 18 U.S.C. § 2, and the court's judgments of count III violations read "in violation of Title 21 U.S.C. Section 841(a)(1) and Section 846 *as charged in Count 3 of the indictment.*" Record at 1248A (emphasis added). In other words, defendants–appellants' argument that "[a]lthough defendants were charged with aiding and abetting, the judgments reflect that they were convicted of possession in violation of 21 U.S.C. § 841" rests on an ultra–technical assertion that the judgment cannot validly incorporate 18 U.S.C. § 2 by explicit reference to the indictment in which the aiding and abetting violation was specifically charged. The argument is without merit.

## IV. ASSIGNMENT, TRIAL, AND SENTENCING PROCEEDING

The procedural history of this case requires brief review. Two judges from districts outside Oregon were to split the pretrial and trial portions of the case, sitting in Oregon by designation. Judge Tanner was assigned the former, Judge Fitzgerald the latter. Upon Judge Fitzgerald's indisposition, Judge Conti of the Northern District of California was designated. Defendants moved to change venue because of publicity. The motion was granted, and the trial was moved to the Northern District of California. Either to promote economy of time and of effort, or because of Judge Conti's familiarity with the case, Judge Conti was reassigned to the trial by Chief Judges Browning and Peckham.

During sentencing of the third defendant to be sentenced, Maggiacomo, Judge Conti said that importing marijuana was a very serious crime that had a "can-

cer"–like effect on society. Presumably this is but an innocuous and unexceptionable paraphrase of congressional sentiment in passing the criminal statutes in question. Nevertheless, Judge Conti's statement inspired counsel for the fourth, seventh, and eighth defendants to be sentenced (Kerr, Spencer Sherman, and Theriaque) to move that Judge Conti recuse himself because of prejudice. This sequence of events prompts three arguments, each largely empty. First, appellants complain of the irregularity of Judge Conti's assignment to the case. They have no basis, however, to advance as error any alleged violation of the Northern District of California's Random Assignment Plan unless they can show actual prejudice. *United States v. Radlick*, 581 F.2d 225, 230 (9th Cir. 1978); *United States v. Torbert*, 496 F.2d 154, 156–57 (9th Cir.), *cert. denied*, 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974). As the remaining discussion will indicate, they did not show this; we need not therefore decide the question of conformity with the Assignment Plan.

The prejudice issue entails the two other complaints, first, that Judge Conti's remarks on the danger of marijuana reveal an impermissible appearance of partiality, *see* 28 U.S.C. § 455(a), and second, that Judge Conti evinced an impermissibly fixed or mechanical view of sentencing.

As to the first, Judge Conti's unexceptionable restatement of a congressional purpose comes nowhere near the sort of apparent ethnic, political, or personal animus at stake in the cases appellants cite to support their point. *See, e.g., Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1931) (German Americans); *Connelly v. United States District Court*, 191 F.2d 692 (9th Cir. 1951) (Communists). Neither the source nor the content of Judge Conti's views on marijuana smuggling indicate that recusal would have been proper. *See United States v. Sibla*, 624 F.2d 864 (9th Cir. 1980) (as amended, April 28, 1980).

The fixed or mechanical sentencing claim is answered simply by pointing out that the sentences imposed here varied

from five to six to eight to ten years in the aggregate, and from two to three to four to five years in respect to the same offense, count III, with correspondingly varied parole terms for each defendant. The sentences were all within the statute's prescription. The fixed view cases cited by appellants generally are so extreme as to be irrelevant here. In one, the judge sentenced all draft evaders to thirty months as a matter of policy. *United States v. Thompson*, 483 F.2d 527, 528 (3d Cir.), *cert. denied*, 415 U.S. 911, 94 S.Ct. 1456, 39 L.Ed.2d 496 (1973). Appellants' reliance on *United States v. Wardlaw*, 576 F.2d 932, 936–38 (1st Cir. 1978), is similarly misplaced, in that there is here no showing that the court's sole motive in imposing the sentence was a general deterrence objective unrelated to the conduct of the defendants actually before the court.

AFFIRMED.