THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
DAN LASHMETT, Defendant-Appellee.

Fourth District   No. 15192

Opinion filed April 16, 1979.—Rehearing denied June 15, 1979.

David R. Cherry, State's Attorney, of Winchester, for the People.

Robert G. Heckenkamp, of Heckenkamp and Simhauser, of Springfield, for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

The State appeals from an order of the circuit court of Scott County granting defendant Dan Lashmett's motions to quash search warrant and to suppress. This appeal raises the question of the constitutionality of an aerial observation of defendant's property and subsequent entry onto defendant's land for the purpose of gathering additional information. Information acquired in this manner was then used to obtain a warrant to search defendant's property.

The complaint for search warrant filed April 12, 1978, by the Scott County sheriff before a circuit judge of that county stated the following: On March 16 and 18 and April 1, 1978, the Scott County sheriff's office received reports that farm equipment was missing from four different Scott County farms, namely, a John Deere model 4020 diesel farm tractor, a red International 20 foot 6 inch wide folding wing disc, a John Deere semi-mounted plow and a John Deere model 6600 hillside combine with a 4-row cornhead. The sheriff drove through Scott County looking for the missing machinery and instructed his deputies to do likewise. He also placed notices in county newspapers. On March 22, 1978, he questioned a local resident who stated that on March 10, 1978, he observed a John Deere model 4430 or 4630 farm tractor pulling an International fold-up wing type wheel disc "being the same type disc as reported missing" on a gravel road north of Winchester waiting to cross highway U.S. 36 and that the person driving the tractor was or looked like a person he knew to be the son of Dan Lashmett. The sheriff also interviewed another person who stated that he had observed a John Deere model 4430 farm tractor on the Dan Lashmett farm on Friday afternoon, March 10, 1978, and at other times prior to that date. The complaint recited why the sheriff considered those people to be reliable informants. On April 11, 1978, the sheriff received an offense report from the Pike County sheriff that parts from a John Deere model 4020 diesel farm tractor, including a vehicle identification plate, were missing from that county.

The complaint further stated that on April 11, 1978, the sheriff "chartered an airplane and flew over the entire territory of Scott County, Illinois in search of equipment matching the general description of the

said missing farm machinery." During this flight, he observed on the premises of Lashmett Industries "what appeared to be a red wheel disc similar to the above-described missing wheel disc." He also observed a green tractor he believed to be a John Deere model 4020 or 4010 in an open feedlot on the farm of Dan Lashmett. Also on the Lashmett farm, in places not visible from the public road, he observed a 4-row John Deere cornhead, a large model John Deere combine, a red wheel disc and a semi-mounted plow. After the above-described aerial investigation, the sheriff personally went on Lashmett's property and observed the identification plate on the John Deere model 4020 farm tractor which bore the same vehicle identification number as the identification plate missing from Pike County.

On the basis of the sheriff's complaint, a warrant to search defendant's farm including lands, feedlots, timbers, fields, and all nonresidence buildings thereon was issued at 7:15 a.m. on April 12, 1978. It authorized seizure of an International wheel disc and the following John Deere machinery: a 4020 diesel farm tractor, 6600 hillside combine, 4-row cornhead, semi-mounted plow, and parts to a 4020 tractor. Pursuant to the warrant, the tractor, disc, plow, combine and cornhead were seized as well as a 3-point John Deere fasthitch and a hood for a John Deere 4020 tractor.

Defendant was then indicted on 6 counts of theft of property with a value over $150, each count charging the theft of a different piece of farm machinery.

Defendant's motion to quash search warrant and motion to suppress alleged that the search and seizure of the above items pursuant to the warrant was illegal and violated his constitutional rights, in part, because information supporting the complaint for search warrant was obtained by an illegal trespass on defendant's land.

■■ The State argues that even if the entry onto defendant's land constituted an illegal search, the aerial observation did not, and that the complaint for search warrant, minus any information obtained by entry onto defendant's land, was sufficient to establish probable cause to issue a search warrant. No Illinois cases involving aerial investigations have been called to our attention, but we do not deem the aerial observation here to have been an illegal search. When the sheriff observed the farm machinery from the airplane, he was in a place where he had a right to be and the machinery was in clear view from that vantage point.

Defendant cites *People v. Sneed* (1973), 32 Cal. App. 3d 535, 108 Cal. Reptr. 146, where the California appellate court ruled that an observation from a helicopter of marijuana being grown on property rented by defendant was an unconstitutional search. The court noted that the helicopter activity was "manifestly exploratory" in nature and that its

position 20-25 feet above the ground was an "obtrusive invasion of privacy" and probably illegal. In dictum, though, the court stated that defendant would certainly have no reasonable expectation of privacy "from airplanes and helicopters flying at legal and reasonable heights." (32 Cal. App. 3d 535, 542-43, 108 Cal. Reptr. 146, 151.) Here, at the hearing on the motions to quash and to suppress, the sheriff testified without objection that the airplane was flying 2400 feet above the ground.

Assuming, *arguendo*, that the information obtained as a result of the entry onto defendant's land can be separated from the other allegations of the complaint for search warrant (*contra, United States v. Nelson* (6th Cir. 1972), 459 F.2d 884), we do not believe the remaining information was sufficient to support the issuance of a search warrant. Absent the incriminating allegation that the tractor on defendant's property had a vehicle identification plate bearing the same number as a plate reported missing from an adjacent county, the complaint alleged only that the sheriff had observed on defendant's property, an assemblage of farm machinery of the same general type and brand as those reported stolen. The record does not indicate that any of the missing equipment would not be used in normal farming operations and no doubt many farmers in the area owned John Deere and International Harvester implements. Nor do we consider anything unusual or unique about this combination of equipment.

We believe that the information acquired by the sheriff by his entry onto defendant's land was necessary to support the issuance of the search warrant in this case. The constitutionality of the sheriff's actions in obtaining this information presents a much more difficult question.

Without objection, the sheriff and one of his deputies testified that at 2 a.m. on the morning following the aerial observation, one of the deputies drove the sheriff and Deputy Bryan to the northeast corner of defendant's property which bordered a county road. The sheriff and Bryan climbed or stepped over a fence and walked across defendant's field to a waterway where they saw the cornhead. The sheriff did not know where the serial number was and could not find it. They then walked 100 yards or less to the tractor, crossing another gate or fence in the process. The tractor was located near a hog shed, near the end of a private driveway which ran from defendant's house out to the hog shed, other outbuildings and a private fishing and swimming pond. The entire area was surrounded by a fence and there were no gates or fences between the house and the tractor. Both the sheriff and defendant testified that the tractor was 100 to 125 yards from the house. The sheriff saw that the number on the tractor's vehicle identification plate matched one that had been reported missing from Pike County. They then went back to the squad car and returned to town. The sheriff contacted the

State's Attorney and sent the two deputies back to defendant's farm to keep it under surveillance. The sheriff stated that to his knowledge, neither he nor any of the deputies had asked defendant or his family for permission to be on the property.

The State argues that the sheriff's entry onto defendant's land to obtain additional information was permissible under the doctrine of "open fields" first enunciated by Mr. Justice Holmes in *Hester v. United States* (1924), 265 U.S. 57, 68 L. Ed. 898, 44 S. Ct. 445. There, revenue officers acting on information approached the house where defendant lived. Seeing a man drive up, they concealed themselves and saw defendant come out and hand him a quart bottle. An alarm was given, defendant took a gallon jug from a nearby car, and both men ran. As they did so, they dropped or threw away the containers, which broke. The officers recognized the contents as moonshine whiskey. Outside the house, they also found a broken jar containing whiskey. On appeal, the Supreme Court rejected defendant's argument that failure to exclude the testimony of those officers violated his rights under the fourth and fifth amendments.

> "It is obvious that, even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle; and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. * * * The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the *special protection accorded by the 4th Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields.* The distinction between the latter and the house is as old as the common law." (Emphasis added.) 265 U.S. 57, 58-59, 68 L. Ed. 898, 900, 44 S. Ct. 445, 446.

The "open fields" doctrine was followed in *Martin v. United States* (5th Cir. 1946), 155 F.2d 503, where investigators acting on information hid behind a shack and watched defendants through large cracks in the wall. The defendants left the shack and approached their car which was parked near the porch. When lights from a passing car illuminated the area, one defendant put the jug he had been carrying on the ground under the car. As he walked away, he was placed under arrest. The jug was found to contain tax-unpaid whiskey. Applying the open fields doctrine, the court on appeal ruled that the officers' examination of the jug did not violate the fourth amendment because the jug was in an unenclosed area around the shed.

The doctrine was also recited in *Janney v. United States* (4th Cir. 1953), 206 F.2d 601, where revenue agents hid near a hog pen and observed defendant and another man carry cartons of the type used in the illicit liquor trade from a pickup parked inside a barn to a car just outside. A fence located about 100 yards away from the house separated the agents from the house, the barn and other outbuildings. The court ruled that seizure of the cartons was made incident to a lawful arrest and that the agents' observations as well as other knowledge they already possessed constituted probable cause for the warrantless arrest.

An analogy to the doctrine was discussed in *United States v. Romano* (2d Cir. 1964), 330 F.2d 566, where revenue agents acting on information entered an industrial complex through a hole in the fence and proceeded through a series of unoccupied and unleased buildings until they came to an alleyway where they detected the odor of fermenting mash coming from a nearby building. They then obtained a search warrant on the basis of that information plus information obtained by another agent who stood outside the complex and used binoculars to observe the inside of the building. Although the court upheld the search on the basis that defendants did not have sufficient interest in the ground over which the agents trespassed, the court also noted that the fourth amendment protection does not extend to unoccupied buildings just as it does not extend to open fields.

This State has recognized the doctrine in *City of Decatur v. Kushmer* (1969), 43 Ill. 2d 334, 253 N.E.2d 425, where the defendant asserted that city officials unlawfully invaded his land without a search warrant and took photographs of his property. The land in question was a large unenclosed yard adjacent to defendant's house where defendant had accumulated scrap metal, old autos and other junk. The condition of the premises could be observed from the street, sidewalk and an alley at the rear of the property. The court ruled,

> "The activities by the appellee's agents did not constitute a search. 'A search implies a prying into hidden places for that which is concealed, and it is not a search to observe that which is open to view. A search implies an invasion and quest with some sort of force, either actual or constructive.' (*People v. Marvin*, 358 Ill. 426, 428; *People v. McCracken*, 30 Ill. 2d 425, 429; *People v. Davis*, 33 Ill. 2d 134, 138.) The condition of the area was exposed to public view and plainly visible from beyond the premises. The officials in entering upon the land merely viewed and photographed a condition already observed by them from public areas. There was no probing into private places and no violation of the appellant's privacy or his home. [*Hester, Janney, Martin.*] Further, the fact

that the officials may have trespassed by entering the land would not, of itself, transform their viewing into an unreasonable search. [*Hester, Janney, Romano.*] Under the circumstances here we find no infringement of the appellant's constitutional assurance against unreasonable searches and seizures." 43 Ill. 2d 334, 338-39, 253 N.E.2d 425, 428.

Fairly recently, in *Air Pollution Variance Board v. Western Alfalfa Corp.* (1974), 416 U.S. 861, 40 L. Ed. 2d 607, 94 S. Ct. 2114, the United States Supreme Court indicated that the "open fields" doctrine still has viability. An inspector for the Colorado Department of Health entered the outdoor premises of respondent without its consent or knowledge in order to conduct a visual pollution test of the smoke emitted from respondent's chimneys. The Supreme Court stated that this was not a violation of respondent's fourth amendment rights, that the inspector had sighted plumes of smoke which anyone in the city near the plant could see in the sky. The court ruled that although the inspector was on respondent's property, the court was not advised that he was on premises from which the public was excluded. It ruled that the inspector was well within the "open fields" exception to the fourth amendment approved in *Hester.*

Decisions of the Federal Circuit Courts of Appeal, however, have placed some limitations on the doctrine. Beginning with *Rosencranz v. United States* (1st Cir. 1966), 356 F.2d 310, those courts have ruled that the area of a farm protected by the fourth amendment includes not only dwelling house but also the "curtilage," *i.e.,* the immediately surrounding area of yards, barns, outbuildings, etc. In *Fullbright v. United States* (10th Cir. 1968), 392 F.2d 432, 435, the court quoted from *Care v. United States* (10th Cir. 1956), 231 F.2d 22, 25, to define the term curtilage as follows:

"Whether the place searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family."

In *United States v. Davis* (5th Cir. 1970), 423 F.2d 974, 977-78, the defendant ran when placed under arrest and was pursued to his own home where he brandished a pistol. The officers fired at him, he threw down the pistol and surrendered. Hours after the arrest, an officer returned to defendant's property to search for the pistol and found it in the yard. The district court ruled that the gun had been found "in plain view." The court on appeal reversed ruling that the first consideration is whether the officer had the right to be in a position to have the view. It stated, "The government will not be heard to say that the 'plain view' rule

applies where the observing officer has physically invaded a *constitutionally protected* area in order to secure the view." (Emphasis added.)

In *United States v. Fluker* (9th Cir. 1976), 543 F.2d 709, the court was required to determine whether a Federal law requiring its agents to give notice of their authority and purpose and be denied admission before they can break down a door as applied to apartment houses had reference only to the doors of individual apartments or to the outer door to the building as well. In ruling that it was applicable to the outer door there because the building had only three apartments and the outer door was kept locked with only the landlord and tenants having keys, the court noted that it had held in *Wattenburg v. United States* (9th Cir. 1968), 388 F.2d 853, that the "curtilage" test was no longer applicable in determining the extent of the area protected by the fourth amendment. Interpreting *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507, the earlier opinion stated:

" '[I]t seems to us a more appropriate test in determining if a search and seizure adjacent to a house is constitutionally forbidden is whether it constitutes an intrusion upon what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public.' " 543 F.2d 709, 716, quoting 388 F.2d 853, 857.

In *United States v. Holmes* (5th Cir. 1975), 521 F.2d 859, an officer trespassed to peer into a shed near a farm house. Citing its opinion in *Davis*, the court stated:

"When a law enforcement agent trespasses solely to unearth evidence of crime, he has no 'right to be in the position to have that view'." (521 F.2d 859, 869.)

The court later stated,

"The government would have us ignore the character of the Moody property. Whatever precautions a homeowner in an urban area might have to take to protect his activity from the senses of a casual passerby, a dweller in a rural area whose property is surrounded by extremely dense growth need not anticipate that government agents will be crawling through the underbrush by putting up signs warning the government to keep away." 521 F.2d 859, 870.

Here, the search of the tractor to determine its serial number took place some 100 to 125 yards from the dwelling house but was near a hog house. In *Hester* the searches and seizures apparently took place just outside a farm house. Unlike in *Kushmer*, the land here was enclosed by an outer fence and an inner fence both of which the sheriff had crossed to get to the tractor. Also unlike in *Kushmer*, the property could not be seen plainly from adjacent public ways, but it could be seen without

intrusion upon defendant's land by flying over in a plane at a reasonable and legal height. Of course, the serial numbers on the equipment could not be seen from the air but it is notable that in *Air Pollution Variance Board* the smoke in question was plainly visible from off the defendant's property but the government agent had to go on the property to take the incriminating test of the smoke.

The search of the tractor took place in an area farther removed from the dwelling than the search on any of the rural properties described in *Davis* and *Holmes*. It cannot be said to be adjacent to the home as in *Wattenburg*. Although the tractor was close to a shed, defendant's photographic exhibits indicate that the shed was isolated from the other farm buildings, negating that it was part of the enclosure surrounding the dwelling or "an area used as an adjunct to the domestic economy of the family." Although the sheriff climbed over two fences to get to the tractor, it was not shown that he had been required to sneak through thick underbrush as in *Holmes*. The distance between the shed and the house and the open nature of the land between also negates an expectation of privacy by defendant in the area of the tractor.

The trial court indicated that whether the test of the search was the defendant's expectation of privacy or the curtilage exception to the "open fields" doctrine the search was unreasonable. We disagree.

In *Hester*, the United States Supreme Court considered the farmyard to be an open field. *Hester* has never been overruled and was cited with approval in *Air Pollution Variance Board*. The opinion in that case stated that the agents' actions were "well within the 'open fields' exception to the Fourth Amendment approved in *Hester*." (416 U.S. 861, 865, 40 L. Ed. 2d 607, 611, 94 S. Ct. 2114, 2116.) The Illinois Supreme Court adopted the "open fields" doctrine in *Kushmer* permitting entry onto a defendant's land to take pictures at closer range than could have been taken from outside the land. The more recent cases of the various circuit courts of appeal cited by defendant are not binding precedent upon us. More importantly, the searches involved in those cases concerned different circumstances. None involved the search taking place as far as 100 yards from the dwelling house in question. No case describing the "open fields" doctrine indicates that it concerns only searches in areas completely isolated from buildings.

■■ We determine the trial court's finding that the instant search was violative of defendant's fourth amendment rights to be contrary to the manifest weight of the evidence. The order suppressing the evidence is reversed and the case is remanded to the trial court for further proceedings.

Reversed and remanded.

MILLS and TRAPP, JJ., concur.