UNITED STATES of America

v.

**Thomas BASSFORD, et al., Defendants.**

**Crim. No. 84–00022–B.**

United States District Court,
D. Maine.

Jan. 28, 1985.

Timothy C. Woodcock, Asst. U.S. Atty., Bangor, Me., for plaintiff.

David Sanders, Livermore Falls, Me., for Thomas Bassford.

Gary M. Growe, Lunn & Growe, Bangor, Me., for Kevin Bradley.

J. Hilary Billings, Marshall A. Stern, Bangor, Me., for Richard Bradley.

## MEMORANDUM DECISION AND ORDER

CYR, Chief Judge.

The defendants are separately charged in a superseding indictment with manufacturing a large quantity of marijuana. They move to suppress certain evidence seized on August 26 and September 3, 1983.

## I.

## FACTS

In August 1983 the Maine State Police [MSP] received a tip from a confidential informant concerning the cultivation of marijuana plants near the residence of defendant Thomas J. Bassford in Salem Township, Maine. On August 25, 1983, after verifying the reliability of the informant, MSP Troopers William Draper and Michael Sperry flew over the Bassford property at an altitude of about 1,000 feet in a small plane piloted by MSP Sgt. Bradford Cochran. During the course of their two passes over the area on August 25, the officers observed four or five plots of vegetation in the generally wooded vicinity of the Bassford residence. The plots were a distinctively brighter green than the surrounding area. Sgt. Cochran considered the bright green coloration of these plots consistent with cultivated marijuana.

On the basis of these aerial observations, Trooper Sperry obtained a warrant from a

state court judge on August 26, 1983 to search "property owned by THOMAS J. BASSFORD and NANCY J. BASSFORD."

On the same day 16 officers, including Troopers Sperry and Draper, set out to search the Bassford property in Salem Township. Earlier that day and prior to commencing the search, Trooper Draper had flown over the Bassford property at a lower altitude than the flight of the previous day in an effort to determine the number of persons in the area of the Bassford property.

The Bassford property consists of a heavily wooded 30-acre parcel situated on the slope of Mt. Abraham. Access to the Bassford property is gained by turning off the main road (Route 142) onto a dirt road (Lovejoy Road) for one mile, proceeding over a right-of-way (East-West Road) on property owned by a "Reverend Reid," and then following an even rougher woods road north for about 600 feet through a "gateway" to Bassford's wood-frame home. The property is bordered on the south and east by the Reid property. A portion of the Reid property was the subject of a pending sale to defendant Richard Bradley. The south property line of the Bassford property consists of a rough stone wall topped with two strands of barbed wire along most of its length. There are two openings in the wall: one through which passes the rough woods road leading to the East-West Road; the other, framed with a wooden arch-type gate, through which a cow path leads from the Bassford house to the environs of a small one-room frame building erected by Richard Bradley immediately north of the East-West Road. At 50-feet intervals along the Bassford boundaries and at the gateways "no trespassing" signs were posted. Brush had been piled about four feet high along the east boundary.

Bassford's nearest year-round neighbors lived about one-half mile away. The Carrabassett Airport, from which the previously described overflights began, is located about ten miles away. There are two or three other small airports in the general vicinity.

In order to reach the Bassford house the police officers walked along the "cow path" leading from the East-West Road. In the clearing where the Bassford house is located the police found two "garden" plots of cultivated marijuana. One plot (Plot # 1), containing 49 plants, was located about 10 feet from the Bassford house and the other (Plot # 2), containing 128 plants, was about 100 feet from the house. In another clearing, about 450 feet from the Bassford house and connected to the house by two paths, the officers found another plot (Plot # 3), containing 50 marijuana plants.

In the course of their search of the Bassford house, numerous articles were seized by the officers. Bassford was given a copy of the search warrant, but the copy he received did not include the affidavit to which the warrant makes reference. The police left an inventory of the items seized from the residence.

Because more than three plots had been observed from the air the officers broadened the scope of their ground search. After walking in a southerly direction on a foot path leading to another clearing, the officers found a larger "garden" plot (Plot # 4), containing 640 plants. Plot # 4 was located about 370 feet from the Bassford house and was completely surrounded by woods.

About 100 feet to the south of Plot # 4 they found a small building, built and occasionally occupied by Richard Bradley. The one-room building, approximately 8 feet by 12 feet, was furnished with a kerosene lamp and two mattresses on the floor. Various personal articles and a portable cooler were also located inside the building. Although there was a stand of birch trees between the back of the building and Plot # 4, there was a low swale where the birches did not completely occlude the view of Plot # 4 from the building.

When the officers came upon the Richard Bradley building, its only door was wide open. Outside the building various gardening tools were discovered. The officers entered the building and seized a roll of film found setting on a board inside. The

film was later developed by the police. The search of the Richard Bradley building was made in the belief that it was on the Thomas Bassford property, which was the subject of the search warrant.

Continuing their search of the area the officers discovered another garden plot (Plot # 5), containing 49 marijuana plants, located along the south side of the East-West Road about 200 feet east of the Richard Bradley building and situated on the property Richard Bradley was in the process of purchasing from Reid.

After completing the August 26 search, the officers learned from a confidential informant that there were other marijuana plots nearby which had not been discovered. On September 2, 1983, Trooper Draper flew over the property of defendant Kevin Bradley in Salem Township. The flight originated from a Phillips, Maine airport. On his return pass over the Kevin Bradley property, Draper used binoculars to assist his observations from an altitude of 1,000 feet.

On September 3, 1983 a state court judge issued a warrant for the search of the "curtilage" of the property of Kevin Bradley, "described as a [one] acre lot with a two-story house located on the east side of Lovejoy Road in Salem Township ... sixtenths of a mile from the junction of [Lovejoy Road] and Route 142." In applying for the warrant, Trooper Draper submitted, *inter alia*, his own affidavit containing the following averments:

> On September 2, 1983 at 4 P.M. this officer flew over the property in question, recognizing the Lovejoy Road as well as a two-story log house as landmarks. Approximately 20 feet from the said house I saw field of marijuana. The field was located on the southeast side of the house.

> I have had prior experience in successfully identifying marijuana from the air. Using a high-powered pair of binoculars, I was able to clearly see that the crop 1,000 feet below was marijuana.

Draper's "prior experience" in aerial identification of marijuana consisted of his par-

ticipation in the August 25 flight over the Bassford property.

On September 3, 1983, police officers executed the search warrant on the Kevin Bradley property. After entering the driveway through a gate the officers saw and seized a number of items from inside and outside the Kevin Bradley home, including farming implements, drying screens, "roaches," dry marijuana and marijuana "trimmings." The officers also found a plot (Plot # 6), 20 feet by 40 feet in size and containing 378 marijuana plants, which was five feet from the back of the Kevin Bradley house. In the woods, several hundred feet from the Kevin Bradley house, the officers discovered eight more marijuana plants growing in buckets.

## II

## MERITS

### A. *Search of the Bassford Property*

Bassford argues that the search of his property pursuant to a search warrant was unlawful because (1) the affidavits submitted in support of the warrant contained information obtained from an unlawful warrantless aerial surveillance of the property, and (2) the warrant was not executed in compliance with the requirements of Fed.R.Crim.P. 41(d) and Me.R.Crim.P. 41(d).

### 1. *Lawfulness of the Aerial View*

The aerial view of the Bassford Property on August 25, 1983 was made from an altitude of about 1,000 feet. No visual enhancement devices were used, though some photographs were taken. Bassford argues that under the recently decided case of *United States v. Oliver*, —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the warrantless aerial search of areas within the "curtilage" of his home was unconstitutional.

In *Oliver*, a divided (6–3) Supreme Court held that the "open fields" doctrine of *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), applies to areas "out of doors in fields," even though those

areas are secluded and posted with "No Trespassing" signs. The *Oliver* decision concerned two warrantless ground searches (one in Maine) in the course of which cultivated marijuana had been discovered. In *Hester*, the Court had held that government intrusion upon open fields is not prohibited by the fourth amendment.

In a portion of the opinion joined by five members of the Court, *Oliver* discussed the *Hester* rule in light of the "reasonable expectation of privacy" test laid down in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Noting that the fourth amendment "does not protect the merely subjective expectation of privacy, but only 'those expectations that society is prepared to recognize as reasonable,'" — U.S. at —, 104 S.Ct. at 1740, *quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring), the Court delineated the factors bearing on whether a governmental search is unlawful.

> In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, ... the uses to which an individual has put a location, ... and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.... These factors are equally relevant to determining whether the government's intrusion upon open fields without a warrant or probable cause violates reasonable expectations of privacy and is therefore a search proscribed by the Amendment.

— U.S. at —, 104 S.Ct. at 1741 (citations omitted).

Although there was no contention in *Oliver* that the areas searched were part of the curtilage of a home, the Court stated that the rule in *Hester* "may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home," *id.* The Court then went on to discuss, in *dictum*, the relationship between "open fields" and curtilage:

> The historical underpinnings of the "open fields" doctrine also demonstrate that the doctrine is consistent with respect for "reasonable expectations of privacy." As Justice Holmes, writing for the Court, observed in *Hester*, 265 U.S., at 57 [44 S.Ct., at 445], the common law distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the home. See 4 Blackstone, Commentaries *225. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," *Boyd v. United States*, 116 U.S. 616, 630 [6 S.Ct. 524, 532, 29 L.Ed. 746] (1886), and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.

*Id.* — U.S. at —, 104 S.Ct. at 1742 (citations omitted).

*Oliver* did not delineate the scope of the curtilage exception to the "open fields" doctrine nor did it speak to the propriety of aerial surveillance of areas within the curtilage but open to view from the air. But the Court did state that "both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air," and noted, with apparent approval, the lower court decisions in *United States v. Allen*, 675 F.2d 1373 (9th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981), and *United States v. DeBacker*, 493 F.Supp. 1078 (W.D.Mich.1980). — U.S. at — & n. 9, 104 S.Ct. at 1742 & n. 9.

In *Allen,* the Ninth Circuit considered the propriety of a Coast Guard helicopter surveillance of an isolated coastal ranch in Oregon suspected of housing a drug-smuggling operation and concluded that the residents of the ranch "could not reasonably bear a subjective expectation of privacy from the Coast Guard's airborne scrutiny," *id.* at 1381. In reaching this conclusion the court considered it significant that: (1) Coast Guard helicopters routinely traversed the nearby air space; (2) due to the proximity of the ranch to the coastline, Coast Guard patrol and surveillance would be expected; (3) the surveillance was undertaken pursuant to a reasonable suspicion, rather than a "random investigation to discover criminal activities;" and (4) the objects observed were "large scale modifications of the Allen Ranch landscape and barn." *Id.*

In *United States v. DeBacker,* 493 F.Supp. 1078 (W.D.Mich.1980), the court held that state police aerial passes at heights of 50 and 200 feet over a farm in the Michigan "boondocks," during the course of which marijuana plants were spotted, did not infringe on any reasonable expectation of privacy, in view of the following factors: (1) low altitude airplane flights over local farm lands were not an infrequent occurrence; (2) society's interest in permitting such "non-intrusive" surveillance outweighs the minor expectation of privacy which might be implicated; (3) the surveillance was brief, sparked by an anonymous tip, not a prolonged intrusion based on a hunch; and (4) the police were in a place they otherwise had a right to be. *Id.* at 1081. *Accord United States v. Mullinex,* 508 F.Supp. 512 (E.D.Ky.1980); *State v. Stachler,* 58 Hawaii 412, 570 P.2d 1323 (1977).

The only authority cited by any of the defendants in support of their claim that the aerial surveillance was unconstitutional, *Dow Chemical Co. v. United States,* 536 F.Supp. 1355 (E.D.Mich.1982), was recently reversed by the Sixth Circuit in *Dow Chemical Co. v. United States,* 749 F.2d 307 (6th Cir.1984), *Dow Chemical* involved Environmental Protection Agency aerial surveillance and photographing of the smoke stack emissions and general layout of a 2,000-acre chemical plant. Applying the two-prong test of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court concluded that there was no "search." Although Dow had an actual expectation of privacy from ground intrusions by virtue of its elaborate security measures, no such expectation existed with respect to aerial observations, because no precautions had been taken to guard against such intrusions. Alternatively, the court concluded that even if any such expectation of privacy existed it was unreasonable in view of the size and urban location of the plant.

▪ Thus, rather than embracing a general rule courts have taken a case-by-case approach to the fourth amendment problems implicated by aerial surveillance. Among the factors to be considered are the height of the aircraft, *see United States v. DeBacker,* 493 F.Supp. at 1081 [noting that low altitude (200 feet) flights over farm land were not unusual]; *People v. Lashmett,* 71 Ill.App.3d 429, 27 Ill.Dec. 657, 389 N.E.2d 888 (1979) [no search involved in viewing farm machinery from altitude of 2,400 feet], *cert. denied,* 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); *People v. Sneed,* 32 Cal.App.3d 535, 108 Cal.Rptr. 146 (1973) [helicopter surveillance at 20–25 feet, unconstitutional]; *Williams v. State,* 157 Ga.App. 476, 277 S.E.2d 923 (1981) [no "search" where plane at lawful height], *cert. denied,* 454 U.S. 823, 102 S.Ct. 108, 70 L.Ed.2d 95 (1981); the size of the objects, *see United States v. Allen,* 675 F.2d at 1381 [large scale modifications of landscape and barn]; *People v. Lashmett, supra* [farm machinery]; *State v. Ryder,* 315 N.W.2d 786 (Iowa 1982) [same]; the nature of the area observed, including the uses to which it is put, *see Dean v. Superior Court,* 35 Cal.App.3d 112, 110 Cal.Rptr. 585 (1973); the frequency of flights over the area, *United States v. Allen, supra; State v. Stachler,* 58 Hawaii 412, 570 P.2d 1323 (1977); and the frequency and duration of the aerial surveillance, *see United*

*States v. Allen, supra; United States v. DeBacker, supra; State v. Stachler, supra; see also United States v. Knotts,* 460 U.S. 276, 283–84, 103 S.Ct. 1081, 1086–87, 75 L.Ed.2d 55 (1983) [suggesting that surveillance which does not otherwise implicate the fourth amendment may do so if too protracted].

There are three or four small airports in the Mt. Abraham region, including one within ten miles of the Bassford property. Bassford acknowledges that small planes frequently fly over Mt. Abraham, although he maintains that it was less common for planes to pass over the side of the mountain on which his home is located. Moreover, the court takes judicial notice of the common use of small planes in Maine to gain access, for a variety of recreational reasons, to even the most remote areas of the state.

Another important factor militating against a reasonable expectation of privacy from aerial surveillance of these properties is the striking contrast between the color of the marijuana plots and the color of the surrounding flora, as clearly evidenced in photographs taken from an altitude of 1,000 feet. It would be unreasonable to expect that the attention of persons flying over the area would not be drawn to the distinctively different coloration of the marijuana vegetation in a densely wooded area on a mountainside where more conventional farming would not be expected.

█ Finally, the brief surveillance involved in the present case, like that in *Allen* and *DeBacker,* was undertaken in response to the receipt of specific information concerning the cultivation of marijuana on the Bassford property. The Court is simply not presented with a surveillance either sufficiently intrusive or protracted to constitute a warrantless infringement upon any expectation of privacy that society is prepared to recognize as reasonable.

█ Defendant Bassford would have the court distinguish aerial observations of the "curtilage" of his home from observations of the area outside the curtilage. The

thrust of the message in all of the aforementioned cases is that aerial surveillance is constitutionally permissible except where it intrudes upon an actual and reasonable expectation of privacy. Thus, "curtilage" considerations appear to be pertinent primarily for purposes of evaluating the existence and reasonableness of the asserted expectation of privacy. *See, e.g., United States v. Roberts,* 747 F.2d 537 (9th Cir. 1984). Indeed, in its brief discussion of the concept of curtilage the *Oliver* Court noted that courts have defined curtilage "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private," — U.S. at ——, 104 S.Ct. at 1742.

█ Although a warrantless search of a home or its curtilage *effected by means of a physical intrusion into the curtilage* violates the fourth amendment absent exigent circumstances, *see United States v. Van Dyke,* 643 F.2d 992, 993 (4th Cir.1981), observations of areas within the curtilage from ground locations outside the curtilage are generally permissible, absent use by the occupant of measures to prevent such observations. *See, e.g., Fullbright v. United States,* 392 F.2d 432, 435 (10th Cir.1968); *State v. Peakes,* 440 A.2d 350, 352–53 (Me. 1982); *see generally* 1 W. LaFave, *Search and Seizure* § 2.3(g) (1978). Under the same reasoning and assuming that aerial surveillance of the particular place is lawful, there would appear to be no sound basis for distinguishing between "curtilage" and "noncurtilage" areas equally visible from the air. In most cases it would be impracticable to view one without contemporaneously viewing the other. Thus, the inquiry is appropriately limited to whether there existed a reasonable expectation of privacy from aerial surveillance of an area, whether curtilage or noncurtilage. *See United States v. Mullinex,* 508 F.Supp. 512, 513 (E.D.Ky.1980).

Although Bassford may well have hoped that planes passing overhead would be occupied by persons uninterested in his unusual farming location and his distinctive

crop, he could not reasonably expect that others, such as the police, would not fly over and take note. All of the plots on the Bassford property, including "Plot # 1," which was about ten feet from the house, were clearly and contemporaneously visible from the same aerial vantage point.

For the reasons already given concerning the lawfulness of aerial surveillance generally, the court concludes that no reasonable expectation of privacy was infringed by the aerial surveillance on August 25, 1983. Accordingly, the information derived from that surveillance was properly included in support of the application for the Bassford search warrant.

2. *Violations of Me.R.Crim.P. 41(d)*

■ Defendant Bassford further claims that he was not given a complete copy of the search warrant and that the search inventory was not *completed* in his presence. *See* Me.R.Crim.P. 41(d). Fed.R. Crim.P. 41(d) is substantially the same as the Maine rule. "The prevailing view [is that such] provisions are deemed to be ministerial only, so that 'absent a showing of prejudice' failure to comply with them does not void an otherwise valid search." 2 W. LaFave, *Search and Seizure,* § 4.12 p. 186 (1978). Defendant presents no evidence of prejudice and no authority or compelling argument for the suppression of the fruits of the warranted search due to the asserted violations of Me.R.Civ.P. 41(d), nor has the Court discerned any.

### B. Search of the Richard Bradley Property

#### 1. Discovery of the Marijuana Plots

Although it concedes that the search of the Richard Bradley property was not authorized by warrant, the Government argues that the discovery of the marijuana plots ("Plot # 4" and "Plot # 5") on the property occupied by Richard Bradley was proper under *United States v. Oliver,* —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

"Plot # 4" was about 100 feet from Bradley's building. "Plot # 5" was about 200 feet away from the building on the south side of the "East-West" Road. Bradley argues that the search which led to the discovery of Plot # 4 invaded the curtilage of the building. Bradley points to a footnote in *United States v. Berrong,* 712 F.2d 1370, 1374, n. 7 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984), which suggests, according to Bradley, that a garden plot found some 75 yards from a camper trailer might be considered within the curtilage of the trailer. However, the footnote merely states that the scope of the curtilage of the camper trailer did not have to be determined because there was no evidence that the movants there had any interest in the camper trailer. Moreover, in its pre-*Oliver* decision the *Berrong* court upheld the district court's finding that a field, located one-quarter of a mile from the Berrong residence and surrounded by a line of trees, was not within the curtilage of the residence:

> The curtilage of the home is formed by the buildings "constituting an integral part of that group of structures making up the farm home," *Walker v. United States,* 225 F.2d [447, 449 (5th Cir.1955)], or "the immediate domestic establishment of the home," *Hodges v. United States,* 243 F.2d [281, 283 (5th Cir.1957)]. The "outer limits of the curtilage" have been expressly defined to be "the outer walls of the extreme outbuildings of the curtilage." *United States v. Williams,* 581 F.2d [451, 454 (5th Cir.1978)]. Since the marijuana field was located beyond all buildings on the Berrongs' property, it was beyond the curtilage of the home.

712 F.2d at 1374. *See also Rosencranz v. United States,* 356 F.2d 310, 313 (1st Cir. 1966).

It has been noted that distance is but one factor to be considered in determining whether an area is within the curtilage of a home:

> "Whether the place searched is within the curtilage is to be determined from the facts, including its proximity and annexation to the dwelling, its inclusion

within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family."

*United States v. Van Dyke,* 643 F.2d 992, 994 (4th Cir.1981), *quoting Care v. United States,* 231 F.2d 22, 25 (10th Cir.), *cert. denied,* 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461 (1956).

The Supreme Court in *Oliver v. United States* adopted a restrictive view of curtilage as the area "immediately adjacent to the home" where one pursues "the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' ..." —— U.S. at ——, 104 S.Ct. at 1742 (*dictum* ).

■ Although the distance (100 feet) between marijuana Plot # 4 and the Richard Bradley building was less than the distance involved in *Berrong,* it was isolated from the building by trees, as was the *Berrong* "garden." Moreover, although the Richard Bradley building occasionally was used as a dwelling, its location and rudimentary features (no heating system, running water, chairs, tables or long-term food storage facilities) do not indicate consistent domestic occupancy. Thus, the "domestic establishment" of the Bradley building cannot reasonably be viewed as extending much beyond its four walls. Although the use of the adjacent land for cultivation might be viewed as activity "associated" with the building, it can hardly be considered "intimate activity" usually associated with home-life, especially given the nondomestic nature of the crop and the separation of the building from the plot by an undeveloped wooded area. The court concludes that Plot # 4 was not within the curtilage of the Richard Bradley building.

Inasmuch as the marijuana plots (Plots # 4 and # 5) on the Richard Bradley property were "out of doors in fields" and not within the curtilage of the "home," the governmental intrusion into those areas was not an unreasonable search. *Oliver v. United States,* —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

Notwithstanding the *Oliver* holding and the fact that a contrary holding by the Maine Supreme Judicial Court was reversed by the Supreme Court of the United States, *State v. Thornton,* 453 A.2d 489 (Me.1982), *rev'd sub. nom., Oliver v. United States,* —— U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), Richard Bradley argues that this court should decide whether the Maine constitution would require the suppression of this evidence.

On remand in *Thornton* the Maine court held that it would not consider Thornton's argument under article I, section 5 of the Maine constitution, because it had not been argued before the suppression justice and because "Thornton never urged that the Maine judiciary should fashion an evidence exclusionary rule for the purpose of enforcing article I, section 5." *State v. Thornton,* 485 A.2d 952, 953 (Me.1984). Thus, the Maine court expressly acknowledged that it has never fashioned an exclusionary rule.

Defendant has pointed to no authority in support of the argument that a violation of a state constitutional provision by state officers would itself bar the use of the illegally obtained evidence in a federal prosecution. Indeed, the authority discovered by the court is to the contrary. *See United States v. Combs,* 672 F.2d 574, 578 (6th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); *United States v. Miller,* 452 F.2d 731, 733–34 (10th Cir.1971).

■ Therefore, the court concludes that the Maine constitution does not preclude use of the fruits of the subject searches.

2. *Search of the Richard Bradley Building*

■ Richard Bradley challenges the warrantless search of his "home," which resulted in the seizure of a roll of film subsequently developed without a warrant. Despite its simpleness and lack of furnishings, there can be no doubt that the Richard Bradley home would qualify as the object of its owner's (occupant's) "legitimate ex-

pectation of privacy ...," *United States v. Trickey*, 711 F.2d 56, 58 (6th Cir.1983).

Trooper Draper testified that he found the door to the Bradley building open and that he saw the film cannister before entering. Assuming that the *discovery* of the film cannister may be said to have been justified under the plain view doctrine, the question remains whether the warrantless seizure and subsequent developing of the film were permissible under the fourth amendment. As the Supreme Court stated in *Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971):

> [P]lain view alone is never enough to justify the warrantless seizure of evidence.... Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

Similarly, the plurality opinion in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), states that " 'plain view' provides grounds for seizure of an item *when an officer's access to an object has some prior justification under the Fourth Amendment.*" *Id.* at 738, 103 S.Ct. at 1540 (*emphasis added*).

The Government suggests that the warrantless seizure of the film cannister "was justified by virtue of its small size and consequent susceptibility to easy disposal." Memorandum of Nov. 28, 1984, at 17. But since no one but the officers was in or near the building, there was no risk of disposal; hence, no exigency justifying its warrantless seizure. Also, inasmuch as the officers could observe, *from outside the building,* that it was vacant, there was no need to enter in order to "secure" the building pending issuance of a search warrant.

■ Even assuming a lawful seizure of the film, the conduct of the officers in developing and viewing the film was not justified by any exigency and thus consti-

tuted a violation of the fourth amendment, *see Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), as the Government concedes.

The items seized from the structure on the Richard Bradley property must be considered the fruits of an illegal search and seizure. Evidence as to their discovery may not be used against Richard Bradley.

### C. Search of the Kevin Bradley Property

Defendant Kevin Bradley challenges the search of his property, undertaken pursuant to a search warrant, on the grounds that: (1) the aerial observation on September 2, 1983, which formed part of the basis for the issuance of the search warrant, was an illegal search; (2) the scope of the ensuing ground search exceeded the area delineated in the search warrant; (3) the seizure of items other than marijuana exceeded the scope of the search warrant; and (4) a false statement by an affiant invalidated the search warrant.

### 1. Aerial Surveillance

Plot # 6 was located approximately five feet from the back of the Kevin Bradley house. The aerial surveillance on September 2, 1983 by Trooper Draper was conducted in much the same manner as the August 25 surveillance of the Bassford property, except that on his second pass over the Kevin Bradley property Draper used binoculars.

■ Even if Plot # 6 were to be considered part of the curtilage of the Kevin Bradley home, the court concludes that the observation of "Plot # 6" from 1,000 feet in the air did not constitute an unreasonable search. *See* discussion in Part II.A.(1) *supra.* However, Trooper Draper's use of "high-powered binoculars" during the second pass over the Kevin Bradley property merits closer attention.

■ Ordinarily, the use of binoculars to enhance one's vision of objects already visible in the open area outside a building does not invalidate an otherwise lawful search. *See, e.g., United States v. Lace*, 669 F.2d

46, 51 (2d Cir.1982); *see also United States v. Hensel,* 699 F.2d 18, 41 (1st Cir.1983) (*dictum*). Although there have been expressions of concern about technologically-aided aerial observations, *see generally* Note: *Warrantless Aerial Surveillance: A Constitutional Analysis,* 35 Van.L.Rev. 409, 426–28 (1982), courts have approved the use of certain technological devices in the course of aerial surveillance. *United States v. Allen,* 633 F.2d 1282 (9th Cir. 1980) [telephoto lens]; *State v. Stachler,* 58 Hawaii 412, 570 P.2d 1323 (1977) [binoculars]. *Compare State v. Knight,* 63 Haw. 90, 621 P.2d 370 (1980) [warrantless aerial observation of area *inside greenhouse* (not visible with the naked eye) with high powered binoculars constitutes unreasonable search].

■ Trooper Draper initially observed the marijuana plants in Plot # 6 without any visual aid. It was on his second pass that Draper used the binoculars. Although there may well be circumstances in which it would be appropriate to restrict the use of sophisticated technological devices for aerial observation of objects otherwise *invisible* to the naked eye, the court is satisfied that Draper's use of binoculars merely enhanced his view of a readily visible marijuana plot previously observed with the naked eye. The use of binoculars did not convert the aerial observation into an unlawful search.

### 2. *Scope of the Search*

The September 3, 1983 search warrant describes the place to be searched as the "curtilege (sic) of Property owned by Kevin Bradley, described as 1 acre lot with a 2-story log house with at least one other building, located on Lovejoy Road in Salem...." Kevin Bradley argues that this description does not include and therefore did not permit the search of the Kevin Bradley house.

The affidavits did not establish probable cause to search the Kevin Bradley *house.* The officers were able to see marijuana cigarettes inside the house, from their vantage point outside. Accordingly, the Government argues that the officers were authorized to enter the house and seize the marijuana cigarettes, as well as other items discovered in plain view during the course of the seizure of the marijuana cigarettes.

The Government misplaces reliance on *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). In that case a police officer placed a college student under lawful arrest and accompanied him to his dormitory room, where the student wished to go to obtain his identification. While watching the arrestee from the hall outside the room, the officer saw what he believed to be marijuana seeds and a small pipe on a desk inside the room; whereupon he entered the room and seized the pipe and seeds. The Supreme Court found that the entry and seizure were lawful, noting that it was "of no legal significance whether the officer was in the room, on the threshold, or in the hallway, since he had a right to be in any of these places as an incident of a valid arrest." *Id.* at 8, 102 S.Ct. at 817.

■ As was the case with the entry into the Richard Bradley building, the Government has shown no lawful basis for entering the Kevin Bradley house without a valid warrant, which it concedes it did not have. The plain view observation of the marijuana cigarettes did not itself justify the warrantless entry and seizure. *See Texas v. Brown,* 460 U.S. 730, 738, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire,* 403 U.S. 443, 468 (1971). Accordingly, the items seized inside the Kevin Bradley home are the suppressible fruits of an illegal search and seizure.

### 3. *Seizure of Items Other Than Marijuana*

■ Since the search warrant described the objects to be seized as "marijuana," Kevin Bradley argues that the police could not lawfully seize items found outside the house, but within the "curtilage," which they reasonably believed to be instruments used in the cultivation of marijuana. How-

ever, these items were observed in plain view in the course of the lawful search for marijuana and, having probable cause to believe that these items were evidence of a crime, the officers, who had a legal right to enter the curtilage by virtue of the search warrant, lawfully seized these items. *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

**4. *"False" Statements by Trooper Draper***

Finally, it is contended that Trooper Draper's affidavit in support of his application for the September 3, 1983 search warrant misstated his prior experience by asserting: "I have had prior experience in successfully identifying marijuana from the air." Trooper Draper testified that he had only viewed marijuana from the air on one occasion prior to his September 2, 1983 flight over the Kevin Bradley property, that occasion being the August 25, 1983 flight over the Bassford property at which time Sgt. Cochran pointed out the marijuana plots.

Inasmuch as Trooper Draper later discovered, in the course of the ground search, that the distinctive bright green plants he had been shown from the air on August 25 were indeed marijuana, it was not incorrect, although it may have been imprecise, for Draper to assert "prior experience in successfully identifying marijuana from the air." Draper did have prior, albeit limited, experience. Although he did not know during the August 25 flight that the bright green patches were marijuana, he was informed that they were and his later personal observation on the ground confirmed that information. Based on this prior experience in the successful (though not unaided) identification of marijuana, Draper recognized what he believed to be marijuana plants during the September 2, 1983 air surveillance of the Kevin Bradley property.

 Assuming that the statement, strictly read, was an inaccurate account of

Draper's experience, the court concludes that it has not been shown that it amounts to a deliberate falsification or that it was made with reckless disregard for the truth, *see Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The search warrant is not rendered invalid by virtue of the inclusion of this statement in the supporting affidavit. *See id.*

### III

### CONCLUSION

For the foregoing reasons, defendant Bassford's motion to suppress is DENIED; defendant Richard Bradley's motion to suppress the items seized in the warrantless August 26, 1983 search inside his building, as well as all evidence of the discovery of these items, is hereby GRANTED, and in all other respects his motion to suppress is DENIED; defendant Kevin Bradley's motion to suppress the items seized in the September 3, 1983 search of the interior of his home, as well as all evidence of the discovery of these items, is hereby GRANTED, and in all other respects his motion to suppress is DENIED.

SO ORDERED.