UNITED STATES of America, Plaintiff,

v.

W.N. Daniel BROADHURST, Gregory Dorland, Joseph Arthur Broadhurst, Steven Strong Townsend, Jr., Deborah Dorland, and Beverly Elizabeth Broadhurst, Defendants.

No. CR.S–84–156 RAR.

United States District Court,
E.D. California.

June 21, 1985.

6/21/85), Charles M. Dresow, San Francisco, Cal. (Personally served by CEO 6/21/85), for defendants.

## MEMORANDUM AND ORDER

RAMIREZ, District Judge.

### PROCEDURAL HISTORY

On July 11, 1984, defendants were charged by way of Indictment filed in the United States District Court, Eastern District of California, with one count of conspiracy to manufacture and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846. In addition, defendants, W.N. DANIEL BROADHURST, GREGORY DORLAND, JOSEPH ARTHUR BROADHURST, and BEVERLY ELIZABETH BROADHURST, were charged in Counts II and III of the Indictment with knowingly and intentionally manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and with knowingly and intentionally possessing with intent to distribute 553 marijuana plants in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

On October 19, 1984, the undersigned issued an Order for Briefing Schedule which required defendants' counsel to file non-dispositive and dispositive motions, as well as appeals from the ruling of the United States Magistrate, within a specified period of time. In response, defendants filed non-dispositive motions to sever, to disclose grand jury materials, joinder, discovery, and for an adjudication on the admissibility of co-conspirator statements. Dispositive motions were filed in the form of motions to suppress evidence and statements, to dismiss, to discover identification of confidential informant, and for an evidentiary hearing on the basis of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

On February 6, 1985, the Court issued an intended decision from the bench in regard to defendants' motions to dismiss and to disclose identity of confidential informant, as well as defendants' appeals from the ruling of the Magistrate in regard to vari-

Doug G. Hendricks, Asst. U.S. Atty., Sacramento, Cal., for U.S.

James Larson, Larson & Weinberg, San Francisco, Cal., Blackmon & Corn, Sacramento, Cal., J. Tony Serra, Serra Perelson & Metcalf, San Francisco, Cal., Paul D. Wolf, Oakland, Cal. (Personally served by CEO 6/21/85), Malcolm S. Segal, Sacramento, Cal. (Personally served by CEO

ous non-dispositive motions. As to the motions to suppress evidence and statements, for evidentiary hearing pursuant to *Franks v. Delaware*, and for adjudication of the admissibility of so-called co-conspirator statements, the matter was continued to February 20, 1985, at which time a hearing was commenced on the limited issue of the affiant's veracity in executing the affidavit in support of search warrant.[1]

On March 6, 1985, the Court ordered supplemental briefing on the issue of aerial overflights and continued the matter to April 12, 1985, at which time additional evidence was adduced and the matter was deemed submitted without benefit of oral argument. The Court continued the matter to May 23, 1985 for final decision and thereafter to June 21, 1985 for ruling on the motion to suppress which included the motion to dismiss/suppress on the basis of *Franks v. Delaware*.

## FACTUAL BACKGROUND

The evidence underlying the charges against the six defendants stems from a search conducted August 17, 1982 of a greenhouse, a shed, and a residence located at 17172 Lague Road, Yuba County. The search in question was made pursuant to a California state warrant obtained on August 12, 1982 by officer James Lovoi of the Sutter County Sheriff's Department. Information contained in the affidavit indicates that on January 21, 1982, officer Lovoi and Drug Enforcement Administration (DEA) agent Del Polish met with a citizen-informant who advised that while deer hunting during the previous October or November, the informant had seen a large greenhouse full of six feet tall marijuana plants. The informant also advised that sleeping bags were seen on trails immediately around the greenhouse, but that no one was seen attending the marijuana plants.

Armed with this information, the officers and the informant traveled to the Lague Road property in Yuba County where the informant pointed out a residence which the informant advised was adjacent to the greenhouse spotted previously in October or November of 1981. Additionally, the informant pointed to a large green-sided shed partially hidden by trees, which was located approximately seventy five yards in a north-easterly direction from the main residence.[2] After making these observations, the officers and the informant left the area.

---

**1.** In the interim period, and on February 13, 1985, respective counsel entered a plea bargain, the exact terms of which have not as yet been revealed to the Court. Pursuant to representations of counsel, it appears that defendants, and each of them, have agreed to enter a plea of guilty to a specified charge in the Indictment, reserving unto themselves the right to contest the accuracy of any court ruling on the issue of the constitutionality of the aerial surveillance and the veracity of statements made in the affidavit in support of the search warrant. *See* F.R.Crim.P. 11(a)(2). Since defendants are obviously content to place all of their "legal eggs in one suppression basket," the Court is of the opinion that a formal written order need not now issue on the rulings of the Court dealing with the non-dispositive and dispositive motions, as well as the appeals from the ruling of the United States Magistrate. Should it become apparent at some time in the future that negotiations have failed in regard to the entry of a conditional plea, the Court would, of course, require counsel for the government to once again take steps to prepare an order in strict compliance with the previous rulings of the Court.

**2.** Based on the evidence adduced during the course of the evidentiary hearing and the photographs presented to the Court for consideration, it appears that the Lague Road property is comprised of the following: approximately 80 acres whereon sits a two story residence, a vehicle garage, a green-sided shed (sometimes referred to as the smaller greenhouse), and a larger greenhouse which is the subject of the Court's inquiry. The vehicle garage is approximately 15 feet in a northerly direction from the residence. The green-sided shed and the larger greenhouse are approximately 75 yards and 125 yards in a northeasterly direction from the residence.

The terrain in between the residence and the greenhouse is hilly with oak trees and grass separating the two. The greenhouse is not visible from the residence and there does not appear to be any road leading directly from the residence to the greenhouse. At the time of the search, the area of Lague Road near the greenhouse was heavily posted advising "no trespassing" and was fenced with barbed wire to preclude entry. (*See* Search Warrant, pp. 2–5).

In April 1982, Yuba County deputy sheriff Mike Williamson told officer Lovoi that an informant who wished to remain anonymous had told Williamson that while deer hunting during the 1981 season with a friend, the informant had seen "marijuana gardens around some greenhouses on Lague Road." The informant further advised that he/she was upset because nothing was being done about the cultivation and the Sheriff's Department had not been patrolling the area.

On May 26, 1982, Lovoi, Bureau of Narcotics Enforcement Agents (BNE) Till and Tellis, and Narcotic Enforcement Team-5 Agent (NET-5) McCormack, went on routine aerial patrol of the Yuba County foothills including the Lague Road area. At an altitude of no less than 1,000 feet the greenhouse previously described was spotted and appeared to be empty inasmuch as "no green plants were visible and white light appeared through the building and at a space at the bottom of the building."

On July 27, 1982, a second routine aerial overflight was made by officer Lovoi, BNE agent Till, and NET-5 agents Peters and Harris. At an altitude of not less than 1,000 feet, officer Lovoi states that he observed green plants in excess of six feet in height inside the suspect greenhouse, the plants being the color and height of which were "consistent with marijuana." At this time Lovoi further observed that the area immediately surrounding the greenhouse did not contain crop-type vegetation, but only natural vegetation.

Subsequent to the July 27, 1982 overflight and prior to the third and last overflight of August 4, 1982, officer Lovoi had cause to investigate the ownership of the Lague Road property, determine who, if anyone, was frequenting the premises, and ascertain that the area on Lague Road near the greenhouse was heavily posted with "no trespassing" signs and fenced with barbed wire. In addition, Lovoi checked with the Yuba County Assessor's Office and found no record of any commercial nursery on the Lague Road property or record of a barn/greenhouse with dimensions matching that of the suspect structure.

On August 4, 1982, Lovoi, together with BNE agent Till and NET-5 agent Garrett, again made aerial observations of the greenhouse and found the greenhouse to contain "green plants estimated to be in excess of six feet in height." Without further investigation, save for the obtaining of a physical description of the residence, officer Lovoi applied for and received a state search warrant on August 12, 1982. On August 17, 1982, the search warrant was executed on the greenhouse and officers discovered and seized approximately 553 marijuana plants, some of which were over eighteen feet tall.

During the course of the *Franks v. Delaware* hearing, officer Lovoi testified that he has been employed by the Sutter County Sheriff's Department for approximately fourteen years, the last five years of which he had been exclusively assigned to the NET-5 team as a narcotics officer. During the latter portion of his career, Lovoi has investigated or assisted in the investigation of over 100 cases involving the use or cultivation of marijuana and has conducted over thirty aerial sitings of marijuana gardens, all of which have been confirmed after subsequent ground investigation.

BNE agent Till testified that he has been employed with the Department of Justice for approximately seventeen years, and was at all times during the instant investigation the pilot of the three overflights. Till indicated that he has made approximately 10,000 overflights of suspected marijuana gardens and that his positive identifications have never been shown to be inaccurate by subsequent ground investigation. In addition, Till estimates that he has viewed between twenty to fifty greenhouses from the air during the course of his overflight surveillance.

NET-5 agent Peters testified that he was a supervisor of the NET-5 task force at the time of the overflights. During his tenure of approximately seventeen years with the Department of Justice, agent Peters has identified at least 100 marijuana

gardens during overflight surveillance which were later confirmed to be marijuana after subsequent ground investigation. Although admitting to extensive experience in the area of marijuana garden identification, Peters testified that prior to the instant siting, he had never participated in an investigation which required aerial observation of a greenhouse.

In describing the purpose of the particular overflights, officers Lovoi and Peters testified that NET–5 was formed in 1980 to assist in the suppression of narcotics activities, that the program consisted of local sheriffs and agents from the State Bureau of Narcotic Enforcement, and that to assist in the suppression activities, the NET–5 team was assigned the use of one airplane which was supplied by the State. In performing so-called "routine aerial surveillance," officer Lovoi testified that frequently the team receives information from confidential, citizen, and anonymous informants concerning the cultivation of marijuana in rural areas. For purposes of verifying the information, the officers conduct aerial surveillance of the suspect premises usually during the course of their random surveillance. In short, due to a shortage of funds, manpower, and aircraft, overflights are conducted on the basis of both specific information received and on a random selection of areas considered to be prime growing areas for the cultivation of marijuana.

Specifically, in regard to the second overflight which was conducted on July 27, 1982, Lovoi testified that the aircraft was flown in a 360 degree circle around the greenhouse so as to permit better viewing of any contents of the greenhouse at different angles. At various times during the overflight, the lighting was better thus permitting Lovoi to discern shadows of foliage through the sides of the greenhouse. Although photographs were taken at the various angles, the photographs failed to depict that which could be seen with the naked eye, i.e., a certain shade of green and a height and configuration of vegetation consistent with marijuana.

Officer Till confirmed the observations of Lovoi as to the color radiating from the greenhouse but could not recall whether the color was visible through the roof of the structure as opposed to the sides of the structure at various angles. Officer Peters testified that he too saw a color and the outline of vegetation which he felt were consistent with marijuana.

In response to the officers' testimony, the defense mounted a furious attack on the veracity of the officers and their supposed observations made during the course of the overflights. In support of their contention that nothing could be seen through the walls and roof of the suspect greenhouse, defendants proffered expert testimony which methodically established the size and configuration of the structure, the probable height, distance, and angle the aircraft was flying at the time various photographs were taken, and the degree to which a person using a telephoto lens could discern color, shape, or size of the contents of the structure through either the roof or the walls.

In attempting to duplicate the condition of the greenhouse and contents thereof on July 27 and August 4, 1982, defense witness Raymond Moritz, an expert in silvaculture ecology, conducted an experiment using 122 eucalyptis gobulus plants measuring approximately six to eight feet tall. The plants were positioned in two rows along the west, south, and east walls of the greenhouse and spaced approximately four feet apart. Although Moritz never viewed the photographs taken by law enforcement officers of the interior of the greenhouse with the marijuana plants in place, he nevertheless attempted to approximate the position and angle of the plants so as to determine what, if any, shadowing effects could be discerned from an aircraft flying at the same altitude, distance, and angle as that testified to by the investigating officers.

In March 1985, the duplicating overflight was conducted over the same greenhouse and allegedly under the same flying conditions. Pursuant to pre-arranged flight instructions (Moritz relied on the prior testi-

mony of the investigating officers and the conclusions of experts who had calculated the officers' altitude, distance, and angle of flight), Moritz flew in a 360 degree circular path around the greenhouse taking photographs and attempting to discern the contents of the suspect structure. According to Moritz, he could neither discern green plants, shadows of green plants, nor any color whatsoever from the interior of the greenhouse.[3]

In arguing for dismissal/suppression on the basis of *Franks v. Delaware*, the defense relied totally on the expert opinion that the experimental overflight duplicated the original overflights in terms of flight time, weather conditions, type of camera used, type of aircraft used, altitude, distance, angle of flight pattern, and nature and relevant number of plants included within the greenhouse. Based on the expert's opinion that nothing could have been seen from within the confines of the greenhouse, even at an altitude of 200 feet, defendants strenuously argued that false and/or misleading information had been included in the affidavit, thus requiring dismissal/suppression.

## DISCUSSION

As previously indicated, defendants filed various non-dispositive and dispositive motions some of which were resolved prior to the evidentiary hearing. *See supra,* note 1. Yet to be resolved are defendants' motions re *Franks v. Delaware* and the motion to suppress evidence. Included in the motion to suppress are sub-issues of standing, good faith belief of the officers, and the constitutionality of the aerial overflights.

### A. *Franks v. Delaware*

In the leading case of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57

L.Ed.2d 667 (1978), the Supreme Court set forth the burden of proof a defendant must meet in order to challenge the veracity of an affidavit in support of a search warrant. In summary, the court held "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2676.

■ The *Franks v. Delaware* standard has emerged as a two-pronged test to be applied by the courts. First, defendant must make a substantial preliminary showing that the affidavit contains an actual and deliberate falsity. Second, the court must determine whether the challenged statement is necessary to a finding of probable cause. *United States v. Davis,* 714 F.2d 896 (9th Cir.1983).

■ In the instant case, the Court has found that the second prong of the *Franks v. Delaware* test has been easily met. Once the information concerning the aerial observation of the greenhouse is struck from the affidavit, only the statements of citizen/anonymous informants remain plus whatever other minimal evidence was adduced by ground investigation. Such information, standing alone, is not sufficient to support a finding of probable cause.[4]

In regard to the first prong of the test, the Court has viewed various government exhibits in the form of overflight photographs which, while not impeaching the statements of the affiant, fail to corrob-

---

**3.** Moritz stated that not only could he not discern green plants or shadows of green plants, he could not see an off-red truck, a yellow tractor, a green bulldozer, and a red sign which had all been placed within the greenhouse for potential identification. While somewhat persuasive, for reasons as more particularly set forth hereinafter, Moritz' failure to observe these items does not detract from the credibility which this Court

imputes to the testimony of officer Lovoi, the affiant.

**4.** While not attempting to quote the record verbatim, the Court recalls that respective counsel orally stipulated that absent the observations from the aerial surveillance, probable cause was lacking and vice versa.

orate the statements in many respects. Having recognized the fact that photographs do not always accurately capture that which the human eye can see, and having considered the affiant's training and experience in marijuana investigation as an important factor in discounting the shortcomings of the photographs, the Court nevertheless granted an evidentiary hearing so as to provide a complete record on the issue of the aerial surveillance as well as the validity of the statements contained in the affidavit. While defendants may not have technically met the substantial showing requirement of *Franks v. Delaware*, the Court found that the allegations of the defendants, when considered in total were more than conclusory claims of bad faith.

The Court has previously referred to the testimony dealing with the alleged false statements contained within the affidavit. Suffice to say, the Court has had an opportunity to see, hear, and question the witnesses presented on the issue of the sufficiency of the affidavit and now chooses to accept the credibility of the affiant against the unsupported assumptions of Moritz' experiment. In making this finding, the Court notes that the expert failed to overcome the following shortcomings of his experiment (1) he had no accurate information as to the original flight times and weather conditions existing during the 1982 overflights; (2) his experimental overflights were conducted in the spring rather than during the relevant summer months; (3) he had no accurate information as to the type of camera and film employed, nor the specific power lens utilized in the taking of the photographs; (4) he had never been provided with government photographs which were at all times in defense counsels' possession; these photographs demonstrate the particular height, density, and color of the plants, and most importantly, the position of those plants in relationship to the walls and roof of the suspect greenhouse.[5]

In rejecting the conclusions of the expert on the issue of "what could or could not be seen," the Court keeps in mind the testimony of the affiant and his fellow investigators who indicated that they were not able to discern leaves, stalks, branches, or buds of the growing marijuana plants. Rather, during the July 27 and August 4, 1982 overflights, the most that could be discerned was certain coloration, shadowy outlines, and heights of plants, and then only through the sides of the buildings at various angles as the aircraft was maneuvering in a 360 degree circular pattern around the suspect structure.

Based on the observations testified to by officer Lovoi as opposed to what the defense expert thought Lovoi could or could not see, the Court concludes that the defendants have failed to meet the heavy burden of *Franks v. Delaware* on the issue of falsity, misrepresentation, or disregard for the truth in the preparation of the affidavit in support of search warrant. For these reasons, the motion of defendants predicated on the theory of *Franks v. Delaware* is herein DENIED.

## B. *Standing*

In the leading case of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court abandoned a separate inquiry into a defendant's standing to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). *See also United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

In deciding whether a defendant has made the requisite showing, the Court must consider the totality of the circumstances including (1) whether the defendant

---

**5.** One need only compare government Exhibit 10 with defendants' Exhibit P (setup photographs) to fully appreciate the unsubstantiated assumptions and improper comparisons which defendants' expert has attempted to interject on the *Franks v. Delaware* issue.

has a property or possessory interest in the items seized or the place to be searched; (2) whether the defendant has a right to exclude others; (3) whether the defendant has exhibited a subjective expectation that the area searched and items seized would remain free from governmental intrusion; (4) whether the defendant has taken normal precautionary measures to maintain his right of privacy; and (5) whether the defendant is legitimately on the premises which are the subject of the intrusion. *Rawlings v. Kentucky, supra.* The defendant's possessory interest in the area searched or the property seized is relevant, but is not dispositive of the issue. A person may have a legitimate expectation of privacy in a place or object he does not own. *United States v. Reyes,* 595 F.2d 275, 278 (5th Cir.1979).

The government has argued that most of the defendants have failed to demonstrate the requisite standing since the property on which the greenhouse was located was never claimed by any of the defendants and since only two defendants, JOSEPH and BEVERLY BROADHURST, were living on the property at the time of the execution of the search warrant. Furthermore, the government argues that since the property was purchased by a person using a fictitious name, even those residing thereon should not be allowed to claim a personal "legitimate expectation of privacy in the invaded place." *Rakas, supra,* 439 U.S. at 143, 99 S.Ct. at 430.

In rebuttal, the defendants argue that every precaution was taken to insure a subjective expectation of privacy in regard to the greenhouse at issue. The defendants claim that (1) the property is in a remote unincorporated area of the county; (2) "no trespassing" signs were erected and the greenhouse was fenced with barbed wire to prevent easy access; (3) the marijuana was cultivated in a greenhouse which had an opaque roof and siding made of a material known as "filon fiberglass," a corrugated substance which is difficult, if not impossible, to see through; (4) the roof and/or sides of the greenhouse were painted with green sunshade; (5) false names were used in the purchase of the property and in various business transactions essential to the success of the greenhouse operation; and (6) other actions were taken to preclude the chance of a plain view siting by the public generally and law enforcement in particular.

Two Ninth Circuit cases dispose of the arguments propounded by respective counsel on the issue of standing. In the case of *United States v. Perez,* 689 F.2d 1336 (9th Cir.1982), the court analyzed the *Rakas* opinion in the context of a case in which several defendants were charged with smuggling heroin in a gas tank of a truck which the defendants were driving or riding in at the time of the arrest and search. In reversing the lower court, the Court of Appeals found that both the driver and the passengers had a sufficient connection with the truck to give rise to a reasonable expectation of privacy. One of the key factors in *Perez* which led to a finding of the expectation of privacy was "their arrangements with [the driver of the vehicle] and their exercise of joint control and supervision of the truck ..." *Id.* at 1338.

In *United States v. Pollock,* 726 F.2d 1456 (9th Cir.1984), the defendant was convicted of thirty seven counts arising from a conspiracy to manufacture and distribute methamphetamine. On the basis of information gathered by a surveillance of the residence belonging to one other than the defendant, a federal magistrate issued a warrant which led to the seizure of a fully operational methamphetamine laboratory. At the same time that Pollock was arrested, the alleged owner of the residence and three other suspects were arrested inasmuch as they were physically on the premises.

In overturning the decision of the trial court, the appellate court relied upon *United States v. Salvucci, supra,* which requires a two-pronged determination for a finding of standing: First, whether the defendant has exhibited an actual, subjective expectation of privacy, and second, whether that expectation is one which society is

prepared to recognize as reasonable. *Pollock*, 726 F.2d at 1465. In finding that legitimate presence on the premises is relevant to, although not a talisman of a legitimate expectation of privacy, the court found that Pollock's activities in regard to the Smith residence and his interest in the laboratory met the *Salvucci* criteria. The record established that Pollock and other defendants had moved their laboratory from place to place to avoid detection, that Pollock had participated in moving the laboratory equipment and chemicals to the Smith residence, and that Pollock used that site to manufacture significant quantities of methamphetamine. In addition, the affidavit in support of the search warrant attested to the fact that the suspicious activity of the defendants in the Smith residence took place during the late night and early morning hours. Moreover, Pollock was arrested on the premises.

The Ninth Circuit found that "a defendant who enters into an arrangement that indicates joint control and supervision of the place searched may challenge a search of the place where contraband is concealed." *Id.* at 1465. Because of the alleged arrangement existing between Pollock and Smith, and the activities in and presence on the premises at the time of the search, the court found that Pollock had met his burden of showing a reasonable expectation of privacy in the Smith residence.

Applying the rationale of *Perez* and *Pollock* to the present facts, the Court finds that all defendants have demonstrated a sufficient interest in the greenhouse to establish an actual, subjective expectation of privacy. Since the defendants, and each of them, had a formalized agreement or at least an arrangement concerning the construction and maintenance of the greenhouse and the cultivation of marijuana therein, the Court finds that the defendants have sufficiently satisfied the two-pronged

test enunciated in *Salvucci,* and as such, have standing to contest the legitimacy of the aerial overflight of July 27 and August 4, 1982.

## C. *Good Faith Rationale*

■ In *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court for the first time held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by officers acting in reasonable "good faith" reliance on a search warrant issued by a detached and neutral magistrate but ultimately determined to be invalid. Courts have rejected extension of the good faith exception to cases involving warrantless searches. *United States v. Merchant,* 760 F.2d 963, 968 n. 6, (9th Cir.1985). *See also United States v. Morgan,* 743 F.2d 1158, 1165 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *United States v. Rule,* 594 F.Supp. 1223, 1238–1239 (D.Maine 1984). In addition, the *Leon* Court limited its ruling to cases in which a detached and neutral magistrate has issued a warrant upon the finding that it is supported by probable cause. Even where the magistrate is subsequently found to be in error, it was the Supreme Court's perception that "the benefits produced by suppressing evidence obtained in objectively reasonable reliance" on the magistrate's finding are "marginal or nonexistent." *United States v. Leon,* 104 S.Ct. at 3421.

In the present case, a warrant was issued prior to the officers' seizure of the marijuana from the Lague Road property. The issue in this case, however, is *not* whether the officers relied in reasonable good faith upon the warrant but rather whether the warrant was "tainted with illegality" and whether therefore "all evidence seized pursuant to it must be suppressed." [6] This issue, in turn, is based on

---

6. *United States v. Alexander,* 761 F.2d 1294 (9th Cir.1985). In *Alexander,* the Ninth Circuit upheld a warrant based on probable cause obtained in part by overflights of defendant's property. The Court declined to reach the issue of

whether the "warrantless overflights" were unlawful "because they violated his reasonable expectation of privacy." at 1299. Although the Court stated that "[t]he legality of overflights poses difficult questions of Fourth Amendment

the broader issue dealing with the legality or illegality of the warrantless overflights which provided the information for probable cause. Since the officers did not rely upon a detached and neutral magistrate *before* conducting the overflights at issue, their good faith, or lack thereof, is irrelevant.

### D. *Legality of the Overflights*

#### 1. *Open Fields Doctrine*

■ In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court reaffirmed the principle first enunciated in *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445–46, 68 L.Ed. 898 (1924) and held that the Fourth Amendment protection against unreasonable government invasions of "persons, houses, papers, and effects" does not extend to "the open fields." *Id.* at 104 S.Ct. 1740–1741. The Court's reasoning was premised on the basic understanding that the "touchstone" of Fourth Amendment analysis is "the question whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *Oliver*, 104 S.Ct. at 1740, *citing Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). In explaining the distinction between open fields and the "certain enclaves" which the Founders recognized "should be free from arbitrary government interference," the *Oliver* Court noted that "as a practical matter [open fields] usually are accessible to the public and the police in ways that a

home, an office or commercial structure would not be." *Oliver*, 104 S.Ct. at 1741. The Court concluded that any expectation of privacy for such activities as crop cultivation in open fields was "not an expectation 'society recognizes as reasonable.'" *Oliver*, 104 S.Ct. at 1741.

Nothing in the *Oliver* opinion suggests that the open fields doctrine was intended to apply to "structures" which by happenstance are located in open fields and which may be used to cultivate agricultural products. To the contrary, the Supreme Court in *Oliver* expressly reaffirmed the traditional understanding that the Fourth Amendment protection afforded to "houses" extends to reasonable privacy expectations in offices and commercial buildings and that such expectations are "also based upon societal expectations that have deep roots in the history of the Amendment." *Oliver*, 104 S.Ct. at 1741 n. 8.[7]

In conclusion, the open fields doctrine is not at issue since the officers who conducted the surveillance were not and had no intention of observing the open fields surrounding defendants' country residence, but rather sought exclusively to observe the contents of an enclosed structure on the land. While this fact alone does not necessarily require a conclusion that defendants' asserted privacy expectation was reasonable, it does render inapplicable the virtually *per se* rule excluding open fields from the protections of the Fourth Amendment.

law," at 1299, a ruling on that issue was unnecessary because even after "[s]ubtracting the overflight information" the remaining information in the affidavit for the warrant independently established probable cause. at 1300. As already pointed out in note 4, *supra*, the government has not argued that the anonymous tips and other corroborating information obtained by the officers before flying over the greenhouse would have independently established probable cause. The Court must assume that the warrant would not have been issued but for the identification of marijuana plants by officers during the warrantless overflights. Thus, the question of the legality of the warrantless overflights is unavoidable under the facts of this case.

7. The *Oliver* Court, citing Ninth Circuit and other lower court precedent, also noted that the "public and police lawfully may survey *lands* from the air." 104 S.Ct. at 1741 (emphasis supplied), *citing* in n. 9, *United States v. Allen*, 675 F.2d 1373, 1380–1381 (9th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *United States v. DeBacker*, 493 F.Supp. 1078, 1081 (W.D.Mich.1980). Plainly, the Court's observation respecting aerial surveillance, particularly considering its careful use of the term "lands," was not intended to extend to surveillance of the interiors of offices, commercial buildings, and other similarly enclosed structures in which reasonable expectations of privacy may be harbored.

## 2. Curtilage

■ In *Oliver*, although neither petitioner nor respondent contended that the property searched was within the curtilage of a residence, the Supreme Court nevertheless made clear that the open fields doctrine "may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, *except in the area immediately surrounding the home.*" *Oliver*, 104 S.Ct. at 1741. (emphasis supplied). It may be inferred from the Court's language that the policy underlying the curtilage exception is the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Id., citing Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639 (1980).

Defendants maintain that the greenhouse which was the subject of the challenged air surveillance was located within the curtilage of a residence situated on the subject property, and, as such, could not be searched from the air under the *Oliver* rule.[8] Defendants' argument is without merit. The *Oliver* decision, while not definitively establishing the scope of the curtilage exception, implied that the reach of residential curtilage does not extend beyond the area "immediately surrounding the home." *Oliver, supra*, 104 S.Ct. at 1741. Moreover, the Court instructed:

> Most of the many millions of acres that are 'open fields' are not close to any structure and so not arguably within the curtilage. And, for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as *the area around the home to which the activity of home life extends* —is a familiar one easily understood from our daily experience.

*Id.* at 1743 n. 12. (emphasis supplied). The Supreme Court's conception of curtilage as the area to which activities of home life extend generally reflects the common law definition of curtilage. *See, e.g., Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) (defining curtilage as the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life."); *United States v. Van Dyke*, 643 F.2d 992, 993, n. 1 (4th Cir.1981) (defining curtilage as "an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with a dwelling.")

The Ninth Circuit has adopted a curtilage analysis which takes into account three principal considerations:

> Whether the place searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family.

*Wattenburg v. United States*, 388 F.2d 853, 857 (9th Cir.1968).

Applying this test to the instant facts, the Court finds that defendants' greenhouse was not situated within the curtilage of the home located on the subject property. First, the greenhouse was neither annexed to the residence, nor was the greenhouse immediately nearby. According to the evidence, the greenhouse was separated from the residence by approximately 375 feet of steep, hilly terrain, oak trees, and grasses. This Court is aware of no cases which extend the curtilage principle to lands so far removed from the geographical center of home life. *See United States v. Bensinger*, 546 F.2d 1292, 1295–1297

---

**8.** The main utility of the curtilage rule is to distinguish open fields which may be subject to the Fourth Amendment's protection from open fields, located away from any home, which are not afforded such protection. The Court nevertheless discusses the curtilage issue in this section for two reasons. First, the curtilage analysis aids the Court in determining whether an expectation of privacy in the greenhouse should be afforded the heightened protection traditionally afforded homes and areas immediately surrounding homes. Second, assuming *arguendo* that activities within the greenhouse are determined by a higher court to be indistinguishable from activities in the open air, only a finding that the greenhouse is within the curtilage could save defendants' Fourth Amendment argument.

(7th Cir.1976). Second, the greenhouse was apparently never included within the general enclosure surrounding the dwelling. It was not fenced within the general residential area.

The only evidence which could be construed to prove any connection between the two areas is a footpath leading from the greenhouse to the residence. However, the greenhouse, built into an embankment on a hill, and at a different ground level than the residence, could hardly be viewed as part of the home's general enclosure.[9] Given these facts, the Court finds that the greenhouse is not located within the curtilage of the home on the subject property.

### 3. *Expectation of Privacy*

The difficult issue yet to be resolved in this case is whether the officers violated defendants' Fourth Amendment right to be free from unreasonable searches, by flying in 360 degree circles around defendants' greenhouse for the sole purpose of discerning the contents of the interior of the structure. This issue is one of first impression and one which obviously implicates serious questions of public policy.

The analysis of the issue begins with *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the landmark decision establishing the reasonable expectation of privacy as the touchstone of Fourth Amendment analysis. Despite a lack of physical trespass by officers, the Supreme Court in *Katz* held that eavesdropping by government agents on conversations in a telephone booth by means of electronic listening devices was an unconstitutional intrusion. The Court stated in historic language:

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.... But what he

seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351, 88 S.Ct. at 511 (citations and footnotes omitted)

The observation that the Fourth Amendment protects "people, not places" is not to be understood as meaning that the "place" is of no relevance. To the contrary, the central question in Fourth Amendment analysis is "what protection it affords those people," and "the answer to that question requires reference to a 'place.'" *Id.* at 361, 88 S.Ct. at 516. Moreover, the *Katz* decision has generally been understood in terms of Justice Harlan's two prong test for protected expectations of privacy: (1) "that a person have exhibited an actual (subjective) expectation of privacy," and (2) "that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* Such analysis invites lower courts to carefully examine the totality of the facts of each case to determine whether the person whose place is searched has manifested an expectation of privacy that society is prepared to recognize as reasonable.

The government argues that defendants have manifested no such reasonable expectation since the outlines of marijuana plants were visible to the officers' "plain view" as they circled the Lague Road greenhouse in their aircraft at altitudes of not less than 1,000 feet. Defendants, on the other hand, urge this Court to recognize the extraordinary measures taken in attempting to protect their privacy and to reject the notion that police, acting upon less than probable cause, may conduct investigatory flights over enclosed agricultural structures for the sole purpose of exposing the contents of such structures.

■ As noted, while the Constitution protects people and not places, the degree

---

**9.** It is less clear whether the third prong of the Ninth Circuit test has been met in the case of a greenhouse. Whether private gardening and agricultural activities might be viewed as "an adjunct to the domestic economy of the family" is subject to multiple interpretations. However, given the location of *this* greenhouse in an area clearly outside the immediate surrounding area of the home, it is unnecessary to determine whether greenhouse gardening should generally be considered a pursuit particularly associated with domestic life.

of protection afforded people often cannot be determined without reference to places. Therefore, as an initial matter, the Court must determine whether greenhouses and similar agricultural structures fall in the category of places in which society is prepared to recognize a reasonable privacy expectation.[10] It is of critical importance that "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819, 56 L.Ed.2d 305 (1978). Additionally, the history of the Amendment and, in particular, the Colonists' experience with the King's sweeping pre-Revolutionary writs of assistance, make it "untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence." *Id.* at 312, 98 S.Ct. at 1820; *accord Oliver v. United States*, 104 S.Ct. at 1731 n. 8.

There has been no argument in this case, nor would such argument prevail, that farmers or other citizens living and working in rural settings so common in the Eastern District of California are not protected in their business enterprises by the Fourth Amendment to the same degree as their urban counterparts. Moreover, agriculture being the main business of a large number of such rural families, the Court can imagine no persuasive rationale for officers to generally presume that protect-

ed business activities are not taking place within greenhouses, barns, sheds, and the like. Thus, the businessperson's generally recognized right "to go about his business free from unreasonable official entries upon his private commercial property," *See v. Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967) is, in this Court's view, held by farmers doing business in greenhouses in no less degree than by other business persons doing business in thriving metropolitan areas.[11]

The inquiry, however, does not end with so simple a discussion. Following *Katz*, " 'a reasonable expectation of privacy,' and not common law property distinctions, now controls the scope of the Fourth Amendment." *United States v. Magana*, 512 F.2d 1169, 1170 (9th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 42, 46 L.Ed.2d 43 (1975). The government has argued that no reasonable expectation of privacy was possible in this particular greenhouse because the shadow outlines of marijuana plants, which provided the probable cause for the subsequent issuance of the warrant, were in "plain view." The Court, of course, agrees that if these facts fit within the "plain view" exception to the warrant requirements of the Fourth Amendment, then there was no search in the constitutional sense, and the evidence should not be suppressed.[12]

**10.** The fact that the greenhouse is located outside the so-called curtilage of the Lague Road farmhouse, standing alone, is of no particular significance. While pre-*Katz* decisions often accorded this fact controlling significance, *see, e.g., Carney v. United States*, 163 F.2d 784, 786 (9th Cir.), *cert. denied*, 332 U.S. 824, 68 S.Ct. 165, 92 L.Ed. 400 (1947), the better post-*Katz* view is that "it will no longer do to declare routinely that any entry of a structure beyond the curtilage is not a Fourth Amendment search." W. LaFave, *Search & Seizure*, § 2.3, p. 315 (1978). Moreover, with the exception of its use in distinguishing between open fields and protected *open* areas near residences, the curtilage test "is predicated upon a common law concept which has no historical relevancy to the Fourth Amendment guaranty." *Wattenburg v. United States*, 388 F.2d 853, 858 (9th Cir.1968) (Christmas tree stockpile between parking lot and lodge premises was subject to reasonable expectation of privacy).

**11.** Moreover, where a rural business structure is located near, although not within, the curtilage of a farm residence, there is manifest a more likely possibility that the business enterprise is related to domestic life. Arguably, this is a factor for the Court's serious consideration in determining whether a privacy expectation in the structure is reasonable. Furthermore, it is at least arguable that a defendant's reasonable expectation of privacy is *heightened* rather than diminished as a result of locating his business in a rural, rather than an urban area. Afterall, privacy is a principal reason to "move to the country."

**12.** It is important to distinguish cases involving "plain view seizures," in which officers, acting upon probable cause based upon a "plain view search" proceed to seize evidence or contraband without first obtaining a warrant. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); and *Texas v.*

 It is undisputed that many visual observations of the type made by officers in this case, assuming the officers are "situated in a place where [they] have a right to be" are not searches within the meaning of the Fourth Amendment. *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979); *United States v. Coplen*, 541 F.2d 211, 214 (9th Cir.1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 791 (1977). Where a person exposes "to the 'plain view of outsiders' " objects or activities expected subjectively to be kept private, they are nevertheless "not 'protected' because no intention to keep them to himself has been exhibited." *Katz v. United States*, 389 U.S. at 361, 88 S.Ct. at 516, (Harlan, J., concurring). The plain view doctrine, therefore, is merely a necessary concomitant to the factual determination of whether or not defendants have displayed a reasonable expectation of privacy.

Thus, the Ninth Circuit has held that where officers observed activities in a motel room through an open window, from a vantage point in a public parking lot ("an area to which many people had access"), there was no intrusion on rights of privacy in the Fourth Amendment sense. *Ponce v. Craven*, 409 F.2d 621, 624–25 (9th Cir. 1969), *cert. denied*, 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970). The *Ponce* court observed that a person who "knowingly exposes his activities to public view ... is not entitled to have those activities protected against searches and seizures." *Id.* at 625. The motel occupant's reliance on privacy, according to the *Ponce* court, was therefore "not reasonable under the circumstances" because, as was evident under those facts, "[i]f he did not wish to be observed, he could have drawn his blinds." *Id.* Similarly, in *United States v. Coplen*,

541 F.2d at 214–15, an agent observing marijuana debris by shining a flashlight through an open window of an airplane did not violate the privacy rights of a defendant who "should have closed off the window from public view" in order to protect those rights. *See also United States v. Martin*, 509 F.2d 1211, 1214 (9th Cir.), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975), (officers observing and smelling ether and acetone through and over defendant's fence from a neighbor's yard, where the neighbor had permitted officers into his yard, did not invade defendant's privacy since defendant had exposed the chemical's properties to the plain sight and smell of his neighbor); *United States v. Fisch*, 474 F.2d 1071, 1077 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973), (officers who intercepted conversations by stationing themselves in a room adjoining defendants', invaded no privacy rights since "the conversations complained of were audible by the naked ear in the next room").

 The cases cited above are each fully distinguishable from this case in that defendants in the previous cases would not have reasonably believed that their activities were shielded from members of the general public or law enforcement officers. Moreover, the officers in each of those cases viewed, smelled, or overheard evidence from public vantage points or other places from where they unquestionably had a right to be. The instant case is far more problematic.

As already discussed in the section of this opinion devoted to "standing," defendants did far more than a typical rural resident would have done if concerned with protecting the privacy of the contents of a similarly situated commercial or agri-

*Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) for examples of the latter. In plain view "seizure" cases, the Ninth Circuit continues to hold that three requirements must be met in order to invoke the plain view doctrine: "first, the officer must be legitimately present; second, the discovery must be inadvertent; and third, it

must be immediately apparent that it is evidence that is seen." *United States v. Humphrey*, 759 F.2d 743, 750 (9th Cir.1985). In this case, however, officers obtained a warrant from a detached and neutral magistrate before physically entering the greenhouse to seize the marijuana.

cultural structure.[13] In addition, there was credible testimony that one or more of the defendants on occasion climbed a nearby hill to see if the contents of the greenhouse were visible to passersby from various vantage points. According to the testimony, the contents of the greenhouse were not visible. While the Court recognizes that there was testimony that an airport was located within a few miles of the Lague Road property, there was absolutely no testimony or other evidence inferring that defendants could have or should have suspected that aircraft might circle the air space directly above the farmhouse and greenhouse. Neither could defendants predict that pilots would employ specialized maneuvers permitting them to catch brief glimpses of light and shadow emanating from the otherwise sealed structure.[14] Finally, it is undisputed that defendants blocked all views of the contents of the greenhouse from every ground level vantage point which is typically occasioned by the general public.

While the facts of this case, therefore, speak forcefully for defendants' vigorous attempts to protect their privacy, the motion is nevertheless not easily decided. For the issue remains, under these circumstances, whether the current state of Fourth Amendment law permits this Court to hold that even this extremely limited failure to protect the privacy of the greenhouse renders defendants' expectation of privacy unreasonable. In the final analysis, however, the Court has found no cases which hold that a person, in order to protect himself from the unwelcome eye of the general public or law enforcement, must lock himself away so tightly, and so completely as to preclude any clever or technologically endowed eavesdropper from viewing his activities from any angle. The Fourth Amendment does not set up a contest between government and private citizen to test which party can outmaneuver the other in a game of hide and seek.[15] Thus,

13. Defendants' expert testified that, in his view, it would have been impossible for officers to see shadows of marijuana plants through the coated walls of the greenhouse even from an altitude of 200 feet. While the Court has chosen not to accept this testimony for its intended purpose, i.e., as an attack on the credibility of the officers, the Court wishes to emphasize that defendants' expert testified credibly and was forthright in conceding the scientific limitations of his experiment. Moreover, the information provided by defendants' expert, in the Court's view, is highly probative of the question of reasonable expectation of privacy. Arguably, the witness established that a reasonable person, even an expert, might have concluded that it was impossible to view the marijuana plants from vantage points from the air or on the ground.

14. The case is obviously distinguishable factually from a case in which officers are inspecting the "open fields" for outdoor marijuana patches, and view shadows of marijuana plants in plain view. It is the Court's finding that but for these specialized maneuvers, aimed specifically at the interior of defendants' greenhouse, the sightings would never have been made. Part of the officers' testimony in this regard was as follows:
TESTIMONY OF AGENT JAMES LOVOI DIRECT EXAMINATION BY MR. HENDRICKS
Q. And with your naked eye, were you able to determine that there were plants growing in there and the approximate color and height of those plants?
A. Yes.

Q. As you stated in your affidavit?
A. Yes.
Q. And could you explain to the Court how you could observe that?
A. While flying around the property at various angles, and we did circle the property at 360 degrees, you're able to see the shadow outlines and heights of the plants through the sidings of the building. You couldn't see the plants at all angles, just at certain angles.
TESTIMONY OF AGENT JAMES LOVOI EXAMINATION BY THE COURT
Q. When you were moving around, as you indicated that circular 360 degree fashion, is that when you were stating that you could see, I believe it was outlines of the plants and/or the various heights of the plants?
A. Yes.
Q. Were you making those observations through the sides of the structure or through the top of the structure as you were in a 360-degree pattern?
A. The sides.

15. Professor Amsterdam, commenting on a state court opinion which interpreted Fourth Amendment rights narrowly, aptly observed in this regard:
this [narrow] approach raises the question of how tightly the fourth amendment permits people to be driven back into the recesses of their lives by the risk of surveillance. Mr. Katz could, of course, have protected himself against surveillance by forebearing to use the

independently of any consideration of the constitutionality of flights over farm structures generally, it is the Court's view that defendants in this case manifested a subjective expectation of privacy which was objectively reasonable.

■ However, alongside the extraordinary measures taken by these defendants to protect their privacy, the Court must also determine whether the officers had a right to be where they were when they made their probable cause observations, i.e., whether their conduct was itself reasonable. While it is beyond doubt that under some circumstances, it is permissible for government agents to conduct flights over property in the course of their investigations of criminal activity,[16] the scope of

that constitutional permission is yet undecided in this circuit.[17]

A decision in the Sixth Circuit, holding that warrantless aerial surveillance of industrial plant emissions by the EPA did not violate Dow Chemical company's reasonable expectation of privacy, provides a number of helpful clues in regard to this analysis. In *Dow Chemical Co. v. United States,* 749 F.2d 307 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2700, 86 L.Ed.2d 716 (1985), the court held that Dow had manifested *neither* a subjective *nor* an objective expectation of privacy from aerial observations. In regard to the lack of subjective expectation the court noted that Dow took no measures whatsoever to establish its expectation of privacy "free from aerial intruders."[18] With respect to

---

phone; and—so far as I am presently advised on the state of the mechanical arts—anyone can protect himself against surveillance by retiring to the cellar, cloaking all the windows with thick caulking, turning off the lights and remaining absolutely quiet. This much withdrawal is not required in order to claim the benefit of the amendment because, if it were, *the amendment's benefit would be too stingy to preserve the kind of open society to which we are committed and in which the amendment is supposed to function. What kind of society is that? Is it one in which a homeowner is put to the choice of shuttering up his windows or having a policeman look in?* W. LaFave, *Search & Seizure,* § 2.2, pp. 260–61 (1978), *citing,* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 402 (1974).

**16.** In *United States v. Allen,* 675 F.2d 1373 (9th Cir.1980), the Ninth Circuit held that under the facts of that case overflights did not constitute an unreasonable intrusion upon defendants' reasonable expectations of privacy. The court relied principally upon the unique setting of the area observed. Coast guard helicopters, the court noted, "routinely traversed the nearby air space for several reasons, including law enforcement." *Id.* at 1381. Moreover, under those facts "any reasonable person, cognizant of the ranch's proximity to the coastline and the Coast Guard's well-known function of sea-coast patrol and surveillance, could expect that government officers conducting such flights would be aided by sense-enhancing devices." *Id.* The Court also relied to a lesser degree on the existence of "some facts" known by the officer who conducted the surveillance which justified a suspicion that "the ranch might be used for drug smuggling." *Id.* Even more telling than the factual distinctions between *Allen*

and the instant case, however, is Judge Kennedy's wise teaching in *Allen,* to wit: "We agree with the defendants that a person need not construct an opaque bubble over his or her land in order to have a reasonable expectation of privacy regarding the activities occurring there in all circumstances. Given the sophistication of electronic photographic devices today, there probably are few unenclosed locations which could not be observed from some airborne location. We are not presented with an attempt to reduce, by the use of vision-enhancing devices or the incidence of aerial observation, the privacy expectation associated with the *interiors of residences or other structures. Id.* at 1380 (emphasis supplied). This passage, in particular, leads this Court to believe that the Ninth Circuit is not prepared to accept air surveillance of the interiors of structures as readily as surveillance of spaces between buildings, as was involved in *Allen.*

**17.** *See* note 6, *supra.*

**18.** 749 F.2d at 312. On this point, the court also stated that Dow need not have built a dome over its plant in order to satisfy the court, however: "Dow could have shielded the critical spaces in between its buildings, if it had an actual expectation of privacy from aerial observation of these regions. A comparison of the precautions a person does take with the precautions he might take, when such precautions are feasible and not unreasonably expensive, is a factor to be considered in determining his privacy expectation *from the kind of intruder* about whom he is complaining." *Id.* at 312–13 (emphasis original). As noted in this Court's description of the extensive precautions taken at the Lague Road property, defendants in this case did everything feasible to block out aerial intruders.

the objective prong of the expectation analysis, the Court, relying on the "open fields" doctrine held that even had Dow manifested a subjective expectation, "the interior spaces out*side* Dow's buildings are not places in which one may have a reasonable privacy expectation." *Id.* at 313 (emphasis supplied). Essentially, the *Dow Chemical* court rejected the fanciful notion of "industrial curtilage" but reaffirmed the "reasonable expectation of privacy in the interior of [Dow's] plant buildings and offices." *Id.* at 314.

In short, the Court is aware of no decision which would extend the practice of overflights by investigating officers to searches of the interiors of residences and other structures. Furthermore, such an extension would, in this Court's view, pose extremely dangerous consequences for the future protection of precious Fourth Amendment rights. The officers in this case, acting on suspicions that marijuana was growing in and around the Lague Road greenhouse, first investigated the structure by air on May 26, 1982. The result of that investigation was that *no* plants were growing on the outside of the structure and none were visible from the interior of the structure. Arguably, the first overflight was justified by the suspicion that marijuana might be growing in the open fields. No such justification existed, however, for the return flights in July and August of 1982. Without an open fields justification for the subsequent flights, the officers candidly admitted that the *sole* purpose for returning to circle the greenhouse by air on July 27 and again on August 4, 1982, was to attempt to observe the *interior* of the structure in a manner they could not do by ground level observation. Additionally, based upon the geographical relationship between the greenhouse and the farmhouse, it is apparent that the officers also circled the residence and its curtilage in attempting to make the observations of the interior of the structure.

## CONCLUSION

In the final analysis, the Court recognizes that aerial surveillance has become an increasingly important tool in law enforcement's effort to stem the growing tide of marijuana cultivation. While law enforcement has employed technological advances to increase its ability to "win the war on crime," the law of search and seizure has been slow in responding to these advances, thus causing courts to continuously reexamine the difficult issue of what constitutes "plain view."

In issuing the present opinion finding the expectations of the defendants to be objectively reasonable, the Court first and foremost recognizes that the protections of the Fourth Amendment are not earth bound. Nor are the protections afforded only to those who engage in activities acceptable by the law abiding masses. The Fourth Amendment does not distinguish between lawful and unlawful conduct, rather the ultimate issue is a balancing process between legitimate law enforcement technique on the one hand, and the privacy rights of citizens in a free and open society on the other.

In the case at bar, the government has attempted to justify its aerial surveillance on the basis that the officers had a right to be in the place from whence the identification of marijuana was ultimately made. In rejecting this argument, the Court recognizes that while a reasonable person might assume some form of privacy invasion from so-called curious aerial passersby, (the search was conducted in an area approximately two miles from an airport) such a momentary invasion of privacy does not equate to the directed aerial search exhibited in this case. Citizens, whether rural or otherwise, should not have to anticipate low flying and/or circling reconnaissance missions in order to protect their reasonable privacy expectations.

Law enforcement in a free society is always faced with difficult challenges. As one court has so eloquently noted, "A policeman's job is easy only in a police

state." [19] While the law properly recognizes the indispensable role of reasonable police investigation and the need for zealous law enforcement activities, the aerial surveillance activities demonstrated by the present facts must give way in favor of precious Fourth Amendment guarantees. Although the officers in this case acted with integrity and the best of intentions in conducting their investigation, the Court finds that there are simply more important values at stake than those associated with the investigation and prosecution of these defendants. Upon consideration of the scope and purpose of the intrusions into the private lives of these defendants, it is the Court's view that the actions of the officers were unconstitutional.

For the reasons stated herein, and although recognizing that reasonable minds may differ as to the precise limitations which should be placed upon aerial surveillance of rural enclaves, the Court finds that the officers had no right to be in the place where they were in July and August of 1982. Therefore, the plain view exception to the warrant requirements of the Fourth Amendment is inapplicable, and the evidence obtained as a result of these overflights must be suppressed. Defendants' motion for suppression is therefore GRANTED.

IT IS SO ORDERED.

---

19. *People v. Spinelli*, 35 N.Y.2d 77, 82, 358 N.Y. S.2d 743, 748, 315 N.E.2d 792, 795 (1974).